# THE ASSIGNED CAR CASES.*

APPEALS FROM THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF PENNSYLVANIA.

Nos. 709, 710, 711, 712, 713, 714, 715, 716, 606, 638. Argued March
2, 3, 1927.—Decided May 31, 1927.

1. Congress may prescribe the conditions on which private cars may
be used on interstate railroads, and how carrier-owned cars shall be
used. P. 575.

2. A rule of the Interstate Commerce Commission which requires that
in determining how many coal cars are available for distribution in
a district, the carrier placing them shall count, in addition to its
own cars, those owned by foreign railroads and assigned to their
fuel service and those owned by and assigned to the service of
private shippers, and which prohibits the carrier, unless permitted
by emergency order of the Commission, from placing for loading at
any mine more than that mine's rateable share of all such cars, but
which does not divert the surplus of cars owned by one shipper to
the use of another—does not involve an unconstitutional taking of
the property of the private car owners, nor invade the private
business affairs of the carrier. P. 572.

3. Paragraph 12 of § 1 of the Interstate Commerce Act, as amended
by § 402 of the Transportation Act, 1920, which declares it the duty
of every carrier by railroad to make just and reasonable distribu-
tion of cars for transportation of coal among the mines served by
it, and, when the supply available for such service does not meet the
mines' requirements, "to maintain and apply just and reasonable
ratings of such mines and to count each and every car furnished to
or used by any such mine for transportation of coal against the
mine," leaves to the Commission the administrative discretion to
determine how the cars shall be distributed. P. 576.

---

* The docket titles of these cases are: *United States et al. v. Ber-
wind-White Coal Mining Co. et al.; Same v. Bethlehem Steel Co.
et al.; Same v. Rainey-Wood Coke Co. et al.; Same v. Public Service
Electric & Gas Co.; Pocahontas Operators' Assn. et al. v. Berwind-
White Coal Mining Co. et al.; Same v. Bethlehem Steel Co. et al.;
Same v. Rainey-Wood Coke Co. et al.; Same v. Public Service Elec-
tric & Gas Co.; United States et al. v. Akron, Canton & Youngstown
Ry. et al.; Pocahontas Operators' Assn. et al. v. Same.*

4. Paragraph 10 of §. 1 of the amended Interstate Commerce Act, defining "car service" as including the distribution of cars "used in the transportation of property" does not limit the Commission's authority to make regulations in respect of coal car service, under pars. 12 and 14, *supra,* to cars supplied by railroads in performance of their common-carrier duties of transportation for the public. The authority extends to cars carrying coal for use as fuel by the transporting, or other, railroad. P. 578.

5. The rule of car distribution here involved is not arbitrary or unreasonable. P. 578.

6. The authority to establish reasonable rules with respect to car service conferred by par. 14 of § 1 of the amended Interstate Commerce Act includes power to make a rule of car distribution uniformly applicable. P. 580.

7. Courts are not to weigh the evidence introduced before the Commission, enquire into the soundness of its reasoning, or question the wisdom of the regulations prescribed by it. P. 580.

8. In making a general rule of coal car distribution the Commission exercises a legislative function and it is not a condition to the validity of the rule that there be adduced evidence of its appropriateness in respect of every railroad to which it will be applicable. P. 582.

9. There is evidence to support the Commission's finding that existing "assigned car" practice caused discrimination in the use of other transportation facilities. The contention that, in adopting the rule here in question, the Commission, under guise of regulating carrier instrumentalities, sought to equalize industrial fortune and opportunity, is unfounded. P. 583.

10. The fact that use of private cars is permitted by Congress and that shippers acquire them in their own interest, does not prevent the Commission from prohibiting their use in a way which will probably result in unjust discrimination against others and prove otherwise detrimental to transportation service. P. 584.

9 F. (2d) 429, reversed.

THESE were suits, five in number, brought in the District Court for the Eastern District of Pennsylvania to enjoin and annul an order of the Interstate Commerce Commission establishing a general rule of coal car distribution, including "assigned cars"—i. e., privately owned cars and railroad fuel cars placed at specified mines for the

use of particular shippers. The defendants in each case were the United States, the Interstate Commerce Commission, and various intervening mine operators. The District Court granted the relief prayed, 9 F. (2d) 429, and appeals were taken to this Court under Jud. Code § 238, as amended, separate appeals being taken in each case by the United States and the Commission, on the one hand, and the other intervening defendants, on the other.

*Mr. Blackburn Esterline,* Assistant to the Solicitor General, with whom *Solicitor General Mitchell* was on the brief, for the United States.

*Mr. R. Granville Curry,* with whom *Mr. P. J. Farrell* was on the brief, for the Interstate Commerce Commission.

*Mr. E. L. Greever* for the Pocahontas Operators' Assn., submitted.

*Messrs. Francis I. Gowen* and *F. M. Rivinus,* with whom *Messrs. Henry W. Biklé, W. S. Bronson, W. L. Kinter, W. A. Northcutt, C. C. Paulding, Theodore W. Reath,* and *C. M. Sheafe, Jr.,* were on the brief, for appellees in Nos. 606 and 638.

*Mr. Walker D. Hines,* with whom *Messrs. Francis B. Biddle, John H. Barnes, August G. Gutheim, Charles Heebner,* and *Wayne Johnson* were on the brief, for appellees in No. 709.

*Mr. Frederick H. Wood,* with whom *Messrs. Frederic L. Ballard, Hoyt A. Moore, Paul D. Cravath, L. A. Manchester, Charles S. Belsterling, Nathan L. Miller,* and *John B. Putnam* were on the brief, for appellees in No. 710.

*Mr. Wayne Johnson* for appellees in Nos. 709 and 713, submitted.

Messrs. *John L. O'Brian, Hugh F. Smith,* and *Ralph J. Baker* for appellees in Nos. 711 and 715, submitted.

Messrs. *Frank Bergen, August G. Gutheim, James W. Carmalt,* and *William H. Speer* for appellees in Nos. 712 and 716, submitted.

MR. JUSTICE BRANDEIS delivered the opinion of the Court.

These five suits were brought in the federal court for eastern Pennsylvania under the Urgent Deficiencies Act, October 22, 1913, c. 32, 38 Stat. 208, 219, to enjoin and annul an order of the Interstate Commerce Commission. The order, which was to become effective March 1, 1925, prescribes for all railroads subject to its jurisdiction a so-called "Assigned Car Rule" governing the distribution of cars among bituminous coal mines in times of car shortage. *Assigned Cars for Bituminous Coal Mines,* 80 I. C. C. 520; 93 I. C. C. 701. Some of the plaintiffs are operators of coal mines, some distributors of coal, some large private consumers of coal, and some are railroads. All had been parties to the proceeding before the Commission in which the order was entered. The defendants in each case are the United States, the Interstate Commerce Commission, and various intervening mine operators. All the defendants answered. The cases were heard together on the evidence before three judges. A final decree granting the relief prayed for was entered in each case on December 15, 1925. *Berwind-White Coal-Mining Co.* v *United States,* 9 F. (2d) 429. The cases are here on appeal under § 238 of the Judicial Code as amended.[1] They were argued together.

_____

[1] In each suit the United States and the Interstate Commerce Commission, on the one hand, and the intervening defendants, on the other, took separate appeals, which were given separate docket

The term assigned cars is used in contradistinction to system cars. By assigned cars are meant those placed for use at a specified mine for a particular shipper. By system cars are meant those, from time to time on the line, which are being kept available for use at any mine for any shipper. Assigned cars are of two classes. One class of assigned cars consists of private cars. These are cars owned (or leased) by some shipper (or subject to the control of a particular person not a rail-carrier) who delivers them to the railroad for placement at designated mines for loading and transportation as desired by the owner of the cars. Assigned cars of the other class are called railroad fuel cars. These consist wholly of cars owned (or leased) by some carrier, which, instead of being left, like system cars, for use indiscriminately in carrying coal from any mine for any consignor to any consignee, are assigned to a particular mine to carry coal to be used as fuel by a particular carrier.

Four of the suits were brought by private car owners. They illustrate different conditions under which, or different purposes for which, private cars are so used. The plaintiffs in No. 709 are coal merchants who operate mines. The plaintiffs in No. 710 are integrated concerns which operate mines solely in order to supply coal to their manufacturing plants. The plaintiffs in No. 711 are by-product coke concerns which do not operate any mine. The plaintiff in No. 712 is a public utility which does not operate any mine. In each of these four cases, the cars owned were acquired by the shipper, and are used, solely in order to assure transportation of an indispensable supply of coal. The number of coal cars used on the railroads of the United States is estimated as between

---

numbers in this Court. Throughout the opinion reference is made, for convenience, only to the appeals of the United States and the Interstate Commerce Commission.

900,000 and 950,000. Of these about 29,000 are private cars.

The fifth suit, No. 606, is brought by owners of railroad fuel cars. The plaintiffs in it are 35 railroads, including many of the leading bituminous coal carriers of the United States and representing each of the several classes of railroad fuel car owners. Railroad fuel cars are divided, according to ownership, into foreign fuel cars, that is, those which belong to, and are used for the fuel supply of, a carrier other than the one on whose lines the mine is located; and home line or system fuel cars, that is, those which are owned by, and are used to supply fuel to, the carrier on whose lines the mine is located. Railroad fuel cars are further classified according to the ownership, use and character of the mine to which they are assigned. That is, whether the cars are used wholly in connection with a mine owned by the carrier which owns the cars; whether they are used in connection with a mine not owned by such carrier but whose whole output is contracted for by it; or whether the mine at which the cars are to be placed is a " commercial " one, that is, a mine which supplies coal also to the general public. About 28 per cent. of all bituminous coal mined is consumed by railroads. The number of the railroads to which the prescribed rule applies is 3073. Of these, all except the 35 plaintiffs in No. 606 have acquiesced in the order.

The subject of discrimination in the distribution of coal cars in times of car shortage has occupied much of the time of the Commission ever since its establishment.[2] Some general investigations of the matter were under-

---

[2] The earliest reported cases are *Riddle, Dean & Co.* v. *Pittsburgh & L. E. R. R. Co.,* 1 I. C. C. 374; *Same* v. *New York, Lake Erie & Western R. R. Co.,* 1 I. C. C. 594; *Same* v. *Baltimore & Ohio R. R. Co.,* 1 I. C. C. 608.

taken by it pursuant to resolutions of Congress.[3] Many specific enquiries were made in passing upon complaints of individual shippers who charged unjust discrimination by individual carriers.[4] In two of these cases, *Railroad Commission* v. *Hocking Valley Ry. Co.,* 12 I. C. C. 398; ·*Traer* v. *Chicago & Alton R. R. Co.,* 13 I. C. C. 451, a rule or practice was prescribed for individual carriers, in 1907 and 1908, which was approved by this Court upon review in *Interstate Commerce Commission* v. *Illinois Central R. R. Co.,* 215 U. S. 452. ·That practice, which became known as the Hocking Valley-Traer rule,

---

[3] See Reports on Discrimination and Monopolies in Coal and Oil, January 25, 1907, pp. 49–81; April 28, 1908; June 9, 1914, 31 I. C. C. 193, 217–224; also *In re Assignment of Freight Cars,* 57 I. C .C. 760.

[4] Between April 28, 1908, and the date of the Commission's second opinion in the case at bar, alleged discrimination in the distribution of coal cars was passed upon by the Commission in 33 opinions written in 28 cases. *Rail & River Coal Co.* v. *B. & O. R. R. Co.,* 14 I. C. C. 86; *Traer* v. *C. B. & Q. R. R. Co.,* 14 I. C. C. 165; *Hillsdale Coal & Coke Co.* v. *Pa. R. R. Co.,* 19 I. C. C. 356; 23 I. C. C. 186; *Jacoby* v. *Pa. R. R. Co.,* 19 I. C. C. 392; *Bulah Coal Co.* v. *Pa. R. R. Co.,* 20 I. C. C. 52; *Colorado, etc., Ass'n* v. *Denver & R. G. R. R. Co.,* 23 I. C. C. 458; *Gay Coal Co.* v. *C. & O. Ry. Co.,* 23 I. C. C. 471; *Consol. Fuel Co.* v. *A., T. & S. F. Ry. Co.,* 24 I. C. C. 213; *In re Irregularities in Mine Ratings,* 25 I. C. C. 286; *National Coal Co.* v. *B. & O. R. R. Co.,* 28 I. C. C. 442; 30 I. C. C. 725; *Huerfano Coal Co.* v. *Colo. & S. E. R. R. Co.,* 28 I. C. C. 502; 41 I. C. C. 657; *McCaa Coal Co.* v. *C. & C. Ry. Co.,* 30 I. C. C. 531; 33 I. C. C. 128; *Vulcan Co.* v. *Ill. Cent. R. R. Co.,* 33 I. C. C. 52; *Greenfield* v. *Pa. R. R. Co.,* 47 I. C. C. 403; *Swaney* v. *B. & O. R. R. Co.,* 49 I. C. C. 345; *Gallatin Coal Co.* v. *L. & N. R. R. Co.,* 55 I. C. C. 491; *Northern Coal Co.* v. *M. & O. R. R. Co.,* 55 I. C. C. 502; *Avella Coal Co.* v. *Pittsburgh & W. Va. Ry. Co.,* 58 I. C. C. 313; 77 I. C. C. 731; *Southern, etc., Ass'n* v. *L. & N. R. R. Co.,* 58 I. C. C. 348; *Griffith* v. *Jennings,* 60 I. C. C. 232; *Dickinson Fuel Co.* v. *C. & O. Ry. Co.,* 60 I. C. C. 315; *Northern W. Va. Ass'n* v. *Pa. R. R. Co.,* 60 I. C. C. 569; *Fairmont & C. Coal Co.* v. *B. & O. R. R. Co.,* 62 I. C. C. 269; *Dering Mines Co.* v. *Director-Gen'l,* 62 I. C. C. 265; *Meyersdale Coal Co.* v. *B. & O. R. R. Co.,* 62 I. C. C. 429; 69 I. C. C. 74; *Northern W. Va. Ass'n* v. *Pittsburgh & L. E. R. R. Co.,* 68

was later adopted, either voluntarily or pursuant to orders of the Commission, by other carriers.[5] So far as concerned private cars, the rule was, in substance, adopted, during federal control, by the Railroad Administration. Car Service Circular 31—effective October 10, 1918; revised December 23, 1919. Upon the termination of federal control, the Commission issued a notice to carriers and shippers (dated March 2, 1920) recommending " that until experience and careful study demonstrated that other rules would be more effective and beneficial," the uniform rule contained in that circular should be continued in effect. Later (April 15, 1920), it recommended that the Hocking Valley-Traer rule be applied by the carriers also to railroad fuel cars.[6] But no uniform rule

I. C. C. 167; *Bell Coal Co.* v. *B. & O. S. W. R. R. Co.*, 74 I. C. C. 433; *Wayne Coal Co.* v. *Director Gen'l*, 92 I. C. C. 3. In addition 23 complaints for discrimination in the distribution of coal cars were dismissed, for various causes, without reported opinion.

[5] See *Royal Coal and Coke Co.* v. *Southern Ry. Co.*, 13 I. C. C. 440; *Rail & River Coal Co.* v. *B. & O. R. R. Co.*, 14 I. C. C. 86; *Hillsdale Coal & Coke Co.* v. *Pa. R. R. Co.*, 19 I. C. C. 356.

[6] Under the Railroad Administration the assignment of cars for railroad fuel had (after July 1, 1918) been vested in the Car Service Division. This division was abolished by the termination of federal control. Confusion resulted. The amendment of the Commission's recommendation made on April 15, 1920, was that rule 8 of Circular 31 should read: " Private cars and cars placed for railroad fuel loading in accordance with the decisions of the Interstate Commerce Commission in *R. R. Com. of Ohio* v. *H. V. Ry. Co.*, 12 I. C. C. 398, and *Traer* v. *Chicago & Alton Railroad Co.*, 13 I. C. C. 451, will be designated as ' assigned ' cars. All other cars will be designated as ' unassigned ' cars."

On September 28, 1920, the Commission issued its Service Order No. 18, effective October 1, renewing its recommendation of April 15, 1920, with the proviso: " That common carriers by railroad may not assign cars for their own fuel and fail to count such cars against the mines' distributive share unless the entire output of such mine is taken by such carrier for a period of not less than six consecutive months." This order was cancelled March 24, 1921, at the time of the commencement of the investigation here involved.

concerning assigned cars applicable to all carriers had been prescribed by the Commission until the entry of the order here complained of; and much diversity in practice existed. Many of the railroads had secured their coal during periods of car shortage without resort to the use of assigned cars; and one, at least, of the leading bituminous coal carriers of the United States declines to permit the use of any assigned cars on its lines.

The rule here assailed was the fruit of an investigation commenced by the Commission of its own motion, in March, 1921, with a view to prescribing just and reasonable rules applicable to all carriers concerning the use of assigned cars for bituminous coal. Every carrier subject to its jurisdiction was made a respondent. Private coal car owners, coal mine operators, coal miners, coal distributors and large coal consumers became parties by intervention. The evidence introduced occupied nearly 6,000 pages. The investigation extended over four years. The reports of the Commission on the original hearing and the rehearing occupy 117 pages of the record. It concluded that the practices expressed in the Hocking Valley-Traer rule, and other existing regulations of carriers, resulted in unjust discrimination and were unreasonable. It ordered that the carriers cease and desist from such practices. And it prescribed the uniform rule which prohibits any carrier from placing for loading at any mine more than that mine's rateable share of all cars, including assigned cars, available for use in the district; unless the carrier is permitted to place more by an emergency order issued by the Commission pursuant to par. (15) of § 1 of the Interstate Commerce Act as amended by § 402 of the Transportation Act, February 28, 1920, c. 91, 41 Stat. 456, 477. This rule requires that, in determining how many cars are available in the district, the carrier placing the cars shall count all cars; that is, it must include with those owned by it, all owned by foreign railroads and

assigned for their fuel service and likewise all owned by private shippers and assigned for their service. Thus, the prohibition embodied in the rule applies to all carriers, whatever the character of the consignor or consignee, and whatever the use to which the coal is to be put.

The operation of the uniform rule may be illustrated by the following example: Assume that there are in the district 10 mines each with a rating, or capacity, of 20 cars a day; that of the 200 cars needed to fill the district's requirement only 100 cars are available on a particular day; and that of the 100, only 85 are owned by the railroad, the remaining 15 being owned by Mine A. Under the rule, the share of each mine would be 10 cars. Mine A would be permitted to have placed its own cars, but only 10 of them. If, on the other hand, 95 of the 100 cars had been owned by the carrier, and only 5 by Mine A, there would be placed at its mine, in addition to its own 5 cars, 5 of the carriers so-called system cars. The rule does not divert the surplus of cars owned by one shipper to use by another. It merely puts a restriction upon the use of the private car by limiting the number of the so-called assigned cars, which may be placed at a particular mine at a particular time. The owner may use the surplus elsewhere. Or he may lease the surplus cars to the carrier or to another shipper. The operation of the rule upon assigned railroad fuel cars is precisely similar. The limitation is imposed in order to improve the service and to prevent any mine (including one operated by a railroad) from securing, at the particular time, more than its rateable share of the aggregate available coal transportation facilities.

The order here assailed differs from the Hocking Valley-Traer rule approved in *Interstate Commerce Commission* v. *Illinois Central R. R. Co., supra,* in two respects. Under the Hocking Valley-Traer rule the carrier was permitted to place at a mine all the cars (whether private or railway fuel cars) which had been assigned to it, even

if the number assigned exceeded its pro rata of all available cars. The prohibition formerly imposed was merely upon placing at a mine any system cars, if it had its full quota from assigned cars. Under the rule here assailed, the carrier is prohibited from placing at a mine more cars than its pro rata, even if all sought to be placed are assigned private cars or railway fuel cars. Moreover, the rule here assailed is a uniform rule governing all carriers without regard to their particular circumstances, whereas the *Hocking Valley-Traer* cases prescribed a practice for the individual carrier after it had been found, upon specific enquiry, that the carrier had been guilty of undue discrimination. Thus, the earlier orders were in their nature largely judicial. The order here attacked is wholly legislative.

No question is here involved concerning those rules, regulations or practices of the carriers by which the ratings of the several mines are determined. See *In re Rules Governing Ratings of Coal Mines, etc.,* 95 I. C. C. 309. No question is raised concerning the limits of the districts into which the carriers' lines are divided for the purpose of applying the rule. No question is raised concerning the adequacy of the supply of system cars. See *Car Shortage, etc.,* 12 I. C. C. 561; *Car Supply Investigation,* 42 I. C. C. 657. Nor is any question presented here concerning the compensation of, or allowance to, private cars owners for the use of their cars in performing the transportation under the tariffs. See *Matter of Private Cars,* 50 I. C. C. 652. There was confessedly no irregularity in the method of proceeding pursued by the Commission. There is a faint contention that the only remedy for violation of the rule is prosecution for the penalty provided by the statute; and that the Commission exceeded its authority in enjoining the placing. The contention is clearly groundless. The order is in a form which, in other connections, has been approved by this

Court. *Baltimore & Ohio R. R.. Co.* v. *Interstate Commerce Commission,* 221 U. S. 612; *United States* v. *Union Stock Yard Co.,* 226 U. S. 286; *Pipe Line Cases,* 234 U. S. 548, 561. The sole question requiring consideration is the validity of the requirement that, unless permission is given by the Commission, carriers shall, in placing assigned cars, be limited to the mine's quota, although the number of cars assigned to it exceeds the quota.

The order is challenged on several grounds. All of the plaintiffs insist that in prescribing a universal rule the Commission has exceeded the powers conferred by Congress. All of the plaintiffs appear to attack the rule also on the ground that it is inherently unreasonable. Some insist that the order is unsupported by the findings and the evidence. Some that the rule involves a taking of property without due process of law. The private car owners urge specifically that the rule is an arbitrary interference with the use of their own property. The railroads urge especially that the rule is an illegal interference with their right to manage their own affairs.

*First.* There is clearly no constitutional obstacle. The rule prescribed does not involve a taking of the property of the private car owner. Congress could exclude private cars from interstate railroads. Compare *United States* v. *Delaware & Hudson Co.,* 213 U. S. 366, 405–6, 411, 415. And it may prescribe conditions on which alone they may be used. See *Procter & Gamble Co.* v. *United States,* 225 U. S. 282; *Swift & Co.* v. *Hocking Valley Ry. Co.,* 243 U. S. 281. Limiting their use does not involve regulation of the coal mining industry. Likewise, Congress may prescribe how carrier-owned cars shall be used. The regulation prescribed does not invade the private business affairs of the carrier. It merely limits the use of certain interstate transportation facilities.

*Second.* The main question for decision is one of statutory construction. It is whether Congress has vested in

the Commission authority to prohibit a use of assigned
cars by a general rule, which in its judgment is necessary
to prevent unjust discrimination among mines or shippers
and to provide reasonable service. The legislation to be
construed is paragraphs 10 to 17, added to § 1 of the
Interstate Commerce Act by § 402 of Transportation Act,
1920, February 28, 1920, c. 91, 41 Stat. 456, 476. The
paragraphs more directly involved are:

"(12) It shall also be the duty of every carrier by
railroad to make just and reasonable distribution of cars
for transportation of coal among the coal mines served by
it, whether located upon its line or lines or customarily
dependent upon it for car supply. During any period
when the supply of cars available for such service does not
equal the requirements of such mines it shall be the duty
of the carrier to maintain and apply just and reasonable
ratings of such mines and to count each and every car
furnished to or used by any such mine for transportation
of coal against the mine. Failure or refusal so to do shall
be unlawful, and in respect of each car not so counted
shall be deemed a separate offense, and the carrier, re-
ceiver, or operating trustee so failing or refusing shall for-
feit to the United States the sum of $100 for each offense,
which may be recovered in a civil action brought by the
United States.

"(14) The Commission may, after hearing, on a com-
plaint or upon its own initiative without complaint, es-
tablish reasonable rules, regulations, and practices with
respect to car service by carriers by railroad subject to
this Act. . . ."

Three widely divergent constructions of paragraph (12)
are urged. The railroads contend that it prescribes a rule
of distribution complete in itself; that the rule there pre-
scribed is the Hocking Valley-Traer rule; and that the
provision neither requires nor permits action by the Com-
mission supplementary thereto. In support of this view

the congressional history of the provision is particularly relied upon. The United States contends also that paragraph (12) prescribes a complete rule of car distribution; but its insistence is that the statute abolished the Hocking Valley-Traer rule and substituted for it a rule identical with that ordered by the Commission. Support for its view is sought particularly in the penalty provision of paragraph (12), in the provision of paragraph (10) which defines car service, and in paragraph (11) which prohibits any unjust and unreasonable practice in respect to car service. The Commission contends that paragraph (12) does not prescribe a complete rule; that it does not require either pro rata distribution of cars or distribution according to the Hocking Valley-Traer rule; that it requires merely that all cars be counted as the basis for determining the pro rata share of each mine; and that it leaves to the Commission administrative discretion to determine how the cars shall be distributed. The Commission's contention is, in our opinion, the sound one. It gives effect to the command that all cars shall be counted; and it leaves full scope both to the duty imposed upon the carriers in paragraph (11), and to the authority conferred upon the Commission in paragraph (14), to establish reasonable rules with respect to car service. This construction is consistent also with the legislative history of the provision, including the action of the conference committee by which the differences between the Senate and House bills were reconciled.[7]

---

[7] The conference committee, House Report No. 650, 66th Cong., 2nd Sess., p. 61, rejected § 34 of the Senate amendment which provided: " That each and every car furnished or used for the transportation of coal during a car shortage period shall be counted against the proportionate distributive share of the mine receiving or using it and that no car shall be furnished to or used by any mine for the transportation of coal during a car shortge period in excess of the proportionate distributive share of such mine regardless in either case of who the consignor or consignors, or the consignee or

55514°—28——37

One other question of statutory construction is urged by the railroads. They deny the authority of the Commission to deal with the distribution of railroad fuel cars. They point to paragraph 10 of § 1, which defines " car service " as including the distribution of cars " used in the transportation of property." The contention is that, because of the phrase quoted, the Commission's authority to make reasonable regulations with respect to car service, conferred by paragraph (14), is limited to the supervision of the performance by railroads of their common-carrier duties of transportation for the public, and does not extend to supervision of their activity in securing fuel for use by the carrier. The contention is, in our opinion, groundless. So far as concerns foreign railroad fuel cars, the owner is obviously in the same position as a private shipper.[8] Carrying coal by a railroad for its own use as fuel is likewise transportation. See *Interstate Commerce Commission* v. *Ill. Cent. R. R. Co.,* 215 U. S. 452, 474. It would require very explicit language to convince us that Congress intended to permit discrimination if effected by the use of railroad fuel cars. Moreover, the phrase in question appears also in paragraph 12, which provides that the carrier must count against the mine all cars used " for transportation of coal."

*Third.* It is contended that the rule prescribed is void because unreasonable. Most of the evidence and much of the briefs and arguments were directed to showing the hardships, waste and losses which would result from the prescribed restriction on the use of assigned cars. Private car owners urge that assigned car mines will be com-

---

consignees, or the owner or owners of the coal loaded or to be loaded into such cars may be, or the purpose for which such coal may be used or intended, or the ownership of such car or cars. . . ."

[8] Compare *Rates on Railroad Fuel,* 36 I. C. C. 1, 9; *Divisions of Joint Rates on Railway Fuel Coal,* 37 I. C. C. 265.

pelled to reduce loadings to conform to the average of system car mines; that private coal cars, representing large investment and sorely needed by their owners, will stand idle on the tracks; that steel industries will be partially or completely shut down and thousands of steel workers will be thrown out of employment; that coke and by-product companies will be partially or completely shut down and their employees temporarily deprived of their means of livelihood; that public utility companies will be compelled to resort to the unsatisfactory and uneconomic spot market for coal; that the supply of gas and electricity to the public will be seriously curtailed; that coal burning steamships will be delayed in sailing; and that the further development and expansion of the important by-product coke process will cease. The railroads urge that the prescribed rule will deprive them of the only effective means of procuring at all times, in dependable volume, suitable coal essential to their operation; that it will increase the cost of coal to them by preventing their running at full capacity the mines owned by them or those whose product they contract for; that it will increase the cost of operation also by depriving them of coal of uniform and approved quality; that in times of greatest car shortage it will involve the non-use by them of a large number of unused private cars; and that it will otherwise prevent efficient transportation service.

There was much evidence that the practice which had been sanctioned in the *Hocking Valley-Traer* cases did not operate satisfactorily. The Commission concluded that it was "not the fruition of ripe experience." Compare *Hillsdale Coal & Coke Co.* v. *Pennsylvania R. R. Co.*, 19 I. C. C. 356, 387. The effort to formulate a rule which would prevent discrimination was resumed. The Commission found that the existing assigned-car practice reduces to a certain extent the supply of cars furnished to commercial mines; that the larger and steadier supply of

cars gives the assigned-car mines a great advantage in steadiness of operation, and hence in cost of production, in the selling markets, and in the labor market; and that, apart from the discrimination inherent in the assigned-car rule, the carriers have been guilty of other willful discriminatory practices, which, as a practical matter, it would be difficult to prevent as long as the rule prevailed. It found also that the use of private cars tends more and more to produce inequalities in the use of other facilities, such as locomotives, tracks, and terminals; and that many, at least, of the so-called car shortages have been due not to an absence of cars but to an inability to move them, i. e., to a shortage of such other facilities. It found, also, that the railroads could, by various devices, obviate most of the difficulty in securing fuel, which they anticipated would result from the order here attacked.

The argument most strongly urged is that, because the rule prescribes absolute uniformity, regardless of the necessities of the railroad or other consumer, regardless of the ownership of the mine or the cars, regardless of the character of the business done by the mine or its customer, it is necessarily unreasonable, and, hence, that the order is void. But the authority to establish reasonable rules conferred by paragraph (14) includes power to prescribe a rule of universal application. There was ample evidence to support the Commission's findings. It is not for courts to weigh the evidence introduced before the Commission, *Western Papermakers' Chemical Co.* v. *United States,* 271 U. S. 268, 271; or to enquire into the soundness of the reasoning by which its conclusions are reached, *Interstate Commerce Commission* v. *Illinois Central R. R. Co.,* 215 U. S. 452, 471; *Skinner & Eddy Corporation* v. *United States,* 249 U. S. 557, 562; or to question the wisdom of regulations which it prescribes, *United States* v. *New River Co.,* 265 U. S. 533, 542,

These are matters left by Congress to the administrative "tribunal appointed by law and informed by experience." *Illinois Central R. R. Co.* v. *Interstate Commerce Commission,* 206 U. S. 441, 454.

We cannot say that it was arbitrary and unreasonable for the Commission to conclude that good service could be secured by a uniform rule which might be departed from with its consent and that unjust discrimination could not be prevented without such a uniform rule. It acted in the light of a rich experience. It had learned by experience that the existing practices resulted in discrimination and unsatisfactory service. It had learned, also through experience, that the emergency powers conferred by the Transportation Act, 1920, afforded adequate means of supplying the needs and of averting the possible hardships and losses, of carriers and of private coal consumers, to which the evidence and arguments had been largely directed.[9] For the Commission had had much experience in applying these emergency powers in connection with this distribution of coal cars in times of car shortage, before it prescribed the rule here challenged.[10] Moreover, so

---

[9] Compare *Peoria & Pekin Union Ry. Co.* v. *United States,* 263 U. S. 528; *United States* v. *New River Coal Co.,* 265 U. S. 533; *United States* v. *Koenig Coal Co.,* 270 U. S. 512; *United States* v. *Michigan Portland Cement Co.,* 270 U. S. 521. See also *Baltimore & Ohio R. R. Co.* v. *Lambert Run Coal Co.,* 267 Fed. 776, modified in *Lambert Run Coal Co.* v. *Baltimore & Ohio R. R. Co.,* 258 U. S. 377; *Avent* v. *United States,* 266 U. S. 127; *Assignment of Freight Cars, Senate Resolution, No. 376,* 57 I. C. C. 760, 766; *Notice to Carriers and Shippers,* I. C. C., April 15, 1920; Service Order I. C. C. No. 18, September 20, 1920; Service Order I. C. C. No. 23, July 25, 1922.

[10] In some cases the emergency order was made applicable to all the railroads of the United States; in some only to carriers within a particular district. In some cases the emergency order applied to many carriers and many mining districts; in others to only a single carrier or a single district. In some cases the order applied only to

far as concerns railroad fuel cars, the operation of the rule as modified from time to time by emergency orders would resemble the practice of the Car Service Section of the Railroad Administration during federal control.[11]

*Fourth.* The contention that findings of the Commission concerning discrimination were unsupported by evidence, or that findings essential to the order are lacking, rests largely upon a misconception. This objection was directed particularly to the finding that the existing prac-

shipments to a particular destination or for a particular purpose or by a particular route; in others the order was not so restricted. In some cases the order governed the shipments until further notice; in some the period was fixed. In some cases there were suspensions. In some cases the order was limited to shipments of a specified amount of coal to a particular consignee. In some cases the order was limited to cars of a particular description. In some the amount to be shipped by each of several carriers was limited. In some the order applied only to mines of a particular character. In some the limitation depended upon the particular conditions existing at the mines. In every case the emergency order recites in general terms the facts found by the Commission as a justification for its action. See Service Order No. 5, June 9, 1920; No. 6, June 19, 1920; No. 7, June 19, 1920; No. 8, June 30, 1920; No. 9, July 13, 1920, amended July 29, 1920; No. 10, July 20, 1920, amended July 24, 1920, Aug. 3, 1920, and Oct. 27, 1920; No. 11, July 26, 1920, amended Aug. 31, 1920, and Sept. 17, 1920; No. 12, Aug. 10, 1920; No. 14, Aug. 25, 1920; No. 15, Sept. 16, 1920; No. 16, Sept. 16, 1920; No. 17, Sept. 16, 1920, amended March 3, 1921; No. 19, Oct. 1, 1920, amended Jan. 15, 1921; No. 20 (superseding No. 15) Oct. 8, 1920, amended Nov. 6, Nov. 15, Nov. 27, 1920; No. 21, Oct. 8, 1920, amended Nov. 24, 1920; No. 25, Sept. 19, 1922, amended Oct. 17, Nov. 18, Nov. 23, and Dec. 8, 1922; No. 26, Nov. 22, 1922, amended Dec. 6, 1922; No. 27, Nov. 28, 1922; No. 28, Nov. 29, 1922; No. 29, Dec. 2, 1922, amended Dec. 11, 1922; No. 30, Dec. 12, 1922; No. 31, Dec. 20, 1922; No. 32, Dec. 30, 1922, amended Jan. 8, 1923; No. 33, Jan. 6, 1923; No. 34, Jan. 6, 1923; No. 35, Jan. 15, 1923; No. 36, Jan. 15, 1923; No. 38, Feb. 9, 1923, amended Feb. 26, 1923; No. 39, March 5, 1923.

[11] Circular C. S. 31, September 12, 1918; Revised December 23, 1919.

tice in regard to assigned cars results in giving to the mines enjoying assigned cars an unjust and unreasonable share of railroad services and of facilities other than cars. The claim is that the evidence, upon which the finding of the resulting discrimination in these other transportation facilities rests, relates to only a few carriers, and that the general finding to that effect is without support, because the evidence introduced was not shown to be typical. Compare *New England Divisions Case*, 261 U. S. 184, 196–197; *United States* v. *Abilene & Southern Ry. Co.*, 265 U. S. 274, 291. The argument overlooks the difference in the character between a general rule prescribed under paragraph (12) and a practice for particular carriers ordered or prohibited under §§ 1, 3 and 15 of the Interstate Commerce Act. In the cases cited, the Commission was determining the relative rights of the several carriers in a joint rate. It was making a partition; and it performed a function quasi-judicial in its nature. In the case at bar, the function exercised by the Commission is wholly legislative. Its authority to legislate is limited to establishing a reasonable rule. But in establishing a rule of general application, it is not a condition of its validity that there be adduced evidence of its appropriateness in respect to every railroad to which it will be applicable. In this connection, the Commission, like other legislators, may reason from the particular to the general.

*Fifth.* Equally unfounded is the contention that, under the guise of regulating carrier instrumentalities, the Commission is seeking to equalize industrial fortune and opportunity. The object of the rule was not to equalize fortunes, but to prevent an unjust discrimination in the use of transportation facilities and to improve the service. In essence, the power exerted is the same as that sustained in *Interstate Commerce Commission* v. *Illinois Central R. R. Co.*, 215 U. S. 452, where it was held that

the Commission had power to prohibit the use of any system car, if the private cars assigned to the mine equalled its quota. The fact that Congress has permitted the use of private cars, and that the shippers' acquisition of them proceeds from the motive of self-interest which is recognized as legitimate, cannot prevent the Commission from prohibiting a use of the equipment in a way which it concludes will probably result in unjust discrimination against others and may prove detrimental otherwise to the transportation service. Compare *United States* v. *Illinois Central R. R. Co.*, 263 U. S. 515, 523, 524; *Virginian Ry. Co.* v. *United States*, 272 U. S. 658, 663–665. The contention is admittedly baseless if, as we have concluded, there is evidence to support the finding that the assigned-car practice causes discrimination in the use of other transportation facilities. For the appellees concede that the possession of private cars confers upon them no superior claim to other services.

The order challenged is valid. The bills must be dismissed. The decrees are

*Reversed.*

The separate opinion of Mr. Justice McReynolds.

A temperate and dependable statement concerning the scope and effect of the order here challenged, taken from the brief of counsel for appellees, is printed in the margin.* And see the carefully-prepared opinion of the

---

* Privately-owned coal cars and cars furnished for railroad fuel coal, are collectively known technically as "Assigned Cars;" this by reason of the fact that they are assigned by the owner of the car (whether a railroad company obtaining coal for fuel, or a shipper owning cars used for the transportation of its coal) for loading at mines, either owned by the owner of the car or with which it has contracts for coal. Coal cars of railroad ownership, other than those assigned to the loading of railroad fuel coal, are known and will be referred to as "system cars."

court below, *Berwind-White Coal-Mining Co. et al. v. United States*, 9 Fed. (2d) 429.

To me it seems plain enough that the real purpose of the order was not rationally to control distribution of

---

Car-distribution rules assume importance only in times of car shortage; that is to say, when car orders exceed car supply. To provide for such periods the capacity of such mine is rated in cars per day. A mine may order cars each day up to but not exceeding its rated capacity and in time of a car shortage generally does so (even though it might not actually have equivalent orders for coal) in order that it may get as many cars as possible.

Under the practice now prevailing, but condemned by the Commission, all private cars (to the use of which system-car mines have no right,—that right being conceded to be exclusively in the owner of the car), and railway fuel cars are placed at the mine to which assigned even though such mine thereby receives cars to a greater extent of its rated mine capacity than is true of mines not having assigned cars. If such cars equal or exceed the *pro rata* of mine capacity to all cars on hand, such mines receive no system cars. It is only when such cars are less than such *pro rata* that such mines share in the distribution of system cars, and then only in such numbers as bring its cars up to such *pro rata*. The distribution of system cars to system mines is of course based on the *pro rata* available. The effect of the Commission's order is to forbid a mine to have the use of any private cars or railway fuel cars in excess of the same proportion or *pro rata* of rated mine capacity to which mines not having assigned cars are able to receive cars.

In respect of railway fuel cars, the effect of the order under review is to prohibit the placement of such cars, in times of car shortage, at any mine owned by the railway company, or with which it has contracts for coal, in sufficient numbers to load the output of such mines (or the proportion thereof taken by the railroad company for fuel purposes), provided the cars required for this purpose exceed the *pro rata* allotment of system cars, of which there is a shortage, at mines at which the company does not obtain fuel, and which, for the loading of their output, are dependent upon system cars.

In respect of private cars, the order prohibits any railroad, where there is a shortage of system cars, from placing private coal cars at any mine of the owner of such cars (or with which it has contracts for coal) in excess of the number of system cars placed on the same

cars during times of shortage, but to force railroads and
other large consumers to apportion their purchases of coal
among a larger number of producers and thus advantage
mines from which such consumers preferred not to buy.
Both carrier and large manufacturer must have steady
supplies of suitable coal, and it may be highly important
to obtain these from one or a few approved mines. But
if such mines are to be denied fuel and private cars dur-
ing times of shortage, then for their reasonable protection

day at a mine of similar capacity, which is dependent upon system
cars for its supply. The order applies irrespective of the number
of such private cars available for placement and loading. It applies
when the carrier has motive power and other facilities sufficient to
move all available cars, both system and private, as well as when it
has not.

The order is universal in its application and admits of no exception
for any cause. It runs against every railroad in the United States,
although as to the conditions on many, including many coal-loading
roads, there was no evidence.

Each of the appellees had found by experience that it could not
rely on the coal equipment of the railroads to provide the daily sup-
ply of suitable coal necessary for its operation in times of periodic
and recurring coal-car shortages, which shortages were due largely to
the sudden expansion of orders for cars on the part of high-cost
mines which operated irregularly and principally only in times when
the coal business was exceptionally active. Each, therefore, became
a private car owner to protect its coal supply at such times. The
mileage allowances made for the use of such cars by the railroad are
insufficient to pay for their upkeep. The only advantage in their
ownership lies in their use in times of car shortage. The order thus
deprives the respondents and other owners of private cars of all
beneficial use thereof. . . .

The order does not require the resulting surplus of private cars to
be appropriated for general use, and the Commission's report dis-
tinctly disclaims any power so to do. Unless the owner consents to
such appropriation, however, cars which he owns and needs, and
which he bought as a protection against system car shortages, must
stand idle, even though the railroad company is able and willing to
place and move such cars and all system cars available for loading
as well.

these great consumers probably will endeavor to scatter their orders.

The railroads of this country are private property. They must be operated by their owners according to law under supervision of the Interstate Commerce Commission; but that body is not intrusted with their management and ought not to be permitted to assume it under any guise. In practice, carriers must use many cars daily for gathering fuel necessary for their operations, and I know of no authority possessed by the Commission to prevent them from purchasing this where and as their managers think best. To permit such interference under the mere guise of a rule for distribution of cars seems to me altogether wrong.

Upon this record we must assume that the carriers have met their obligation to provide an adequate number of system cars.

The practice of hiring and using private cars by railroad has been recognized and accepted by both Congress and the Commission. It has enlarged the total number of cars available for use and thereby aided all shippers. Those who provide private cars take nothing from any other shipper, but heretofore have secured the use of such cars for themselves although, because of temporary shortage, the system cars were insufficient to meet the demands of others.

If the order was intended to enlarge the total supply of cars or bring about more equitable distribution of available cars in times of shortage, it was foolish. Supply cannot be increased, nor equitable distribution enforced, by prohibiting the use of private or fuel cars when most needed—requiring them to stand idle on the sidings. If, on the other hand, as I must think, the real purpose was to force large consumers to scatter their purchases, the order goes beyond any power intrusted to the Commission.

The decree below should be affirmed.