**LYNCHBURG TRAFFIC BUREAU v. UNITED STATES et al.**

**Civ. A. No. 203.**

United States District Court
D. W. Virginia, Lynchburg
Division.

Argued May 5, 1949.

Decided June 30, 1949.

W. G. Burnette, Lynchburg, Va., for plaintiff.

Edward Dumbauld, Herbert A. Bergson, Washington, D. C., and Howard C. Glimer, Jr., Pulaski, Va., for the United States.

J. Stanley Payne, Daniel W. Knowlton, Washington, D. C., for Interstate Commerce Commission.

D. Lynch Younger, Roanoke, Va., Paul V. Miller, Philadelphia, Pa., and Frank H. Cole, Jr., Cincinnati, Ohio, for the railroads.

Before DOBIE, Circuit Judge, PAUL, Chief Judge, and BARKSDALE, District Judge.

DOBIE, Circuit Judge.

The present civil action was brought by the plaintiff, Lynchburg Traffic Bureau, a Virginia corporation representing business firms in the City of Lynchburg in transportation matters, to have set aside and annulled certain orders and reports of the Interstate Commerce Commission (hereinafter referred to as the Commission). A special court was constituted, as required by 28 U.S.C.A. §§ 2284, 2325, to hear and determine the action.

A brief review of the history and background of the orders here involved is necessary for an understanding of their significance.

The geographical area east of the Mississippi River is divided into two major rate territories. What is known as Official Classification (or Official) Territory embraces that territory east of the Mississippi and north of a line which follows the Ohio River from its mouth to Cincinnati and then follows the lines of certain railroads through West Virginia and Virginia to Norfolk, Virginia. Southern Classification (or Southern) Territory embraces the area east of the Mississippi and south of Official Territory.

The class rate structures applicable within each of these two territories were prescribed by the Commission, following extensive investigations, in Eastern Class Rate Investigation, 164 I.C.C. 314 (1931), and Southern Class Rate Investigation, 100 I.C.C. 513 (1928). With respect to traffic moving intraterritorially, the class rate of the particular territory through which the traffic moves, governs. But since the rates and the classifications of various commodities applicable within the two territories are different, there is presented the problem of effecting a fair and equitable adjustment of rates on traffic moving interterritorially. The orders of the Commission presently under attack were designed

to effect, on such traffic, a more equitable adjustment than has hitherto existed.

Prior to the orders in question, the rates on interterritorial traffic were determined, generally, as follows: Certain so-called "hold-points" (i. e., points in Official Territory through which interterritorial traffic would pass) were designated on the border between Official Territory and Southern Territory. Cities, then, in Southern Territory were grouped around each of these hold-points. For example, for traffic moving from a particular section in Official Territory to Danville, Virginia, Lynchburg, Virginia, is the hold-point; and Danville, for such traffic, is said to be in the "Lynchburg Group." Basically, the rates on interterritorial traffic were those prescribed for the Southern Territory, but it was provided that, where these rates were below the level of the Official Territory rates applicable between the extreme point in Official Territory and the hold-point, the latter rate would govern. In other words, the Southern Territory rates governed interterritorial shipments with a qualification that the Official Territory rate to the hold-point should provide a minimum.

Prior to 1940, this basic adjustment was applicable to both carload and less-than-carload traffic. During the nineteen-thirties, however, the southern rail carriers had suffered from rising competition from the motor carriers. In order to meet this competition, all ratings on less-than-carload traffic above third-class were reduced to that level, and the minimum rate provision on interterritorial traffic was made inapplicable to less-than-carload freight.

Since these reduced ratings were applicable only within Southern Territory and interterritorially, the result was that on less-than-carload interterritorial traffic the through rates between many points in Southern Territory and points in Official Territory were, in numerous instances, less than the rates between the intermediate points in Official Territory. This, of course, resulted in departures from 49 U.S. C.A. § 4(1), which Fourth Section Departures were authorized by the Commission in Fourth Section Order 14001.

The obvious inequities of this adjustment led to negotiations and investigations following which the Commission approved the orders here under discussion. These orders are contained in a report by the Commission. Minimum Rates on Rail Traffic Between the North and the South, 273 I.C.C. 33 (Nov. 10, 1948). Very briefly, the orders provide a new organization of hold-points and groupings designed to bring the hold-points into closer harmony with the service routes over which traffic actually moves between north and south. And (the chief point of contention) the new orders made applicable as a minimum on interterritorial traffic (both carload and less-than-carload) the rate between Official Territory origin or destination and the appropriate hold-point at the border. Inasmuch as the Southern ratings (reduced to meet motor carrier competition) are still lower with respect to many articles than the ratings in effect in Official Territory, the minimum rate provision determines the charges on many interterritorial shipments into and out of cities in Southern Territory close to the border. This, of course, results in blanketing the rates applicable throughout these defined "Groups" in Southern Territory at the level of the rate to the particular border point chosen as a hold-point for that group.

An example may best serve to highlight plaintiff's objection to these orders. Danville, Virginia, is located within Southern Territory approximately 65 miles south of Lynchburg, Virginia, in Official Territory. The first-class rate on traffic between New York and Lynchburg is 111 cents; between New York and Danville, 120 cents. Shoes, clothing, dry goods, etc., are classified first-class in Official Territory, but, due to the exceptions to the Southern Classification effected in 1940, these items are all classified third-class in Southern Territory. The third-class rate from New York to Danville is 84 cents. Since New York and Lynchburg are both in Official Territory, the first-class ratings and the resulting rate of 111 cents are applicable to shipments of these commodities between those cities. Since, however, the Southern ratings govern interterritorial shipments, the

rate on shipments of these commodities between New York and Danville would be the third-class rate of 84 cents, were it not for the minimum provision of the present orders. That provision raises the rate to and from Danville to the rate of 111 cents applicable to and from Lynchburg.

Although this adjustment is obviously more equitable than that which preceded these orders, plaintiff complaints that due to the application of the same rate to both Lynchburg and Danville, Danville is receiving 65 miles of "free transportation services."

The plaintiff's position, essentially, presents a frontal attack on the practice of establishing a uniform blanket, or group, rate applicable to many points within a given area. This is true since, due to the minimum rate provision of the new orders, there are no instances in which a lesser charge is made for carriage over a greater distance. We are therefore not concerned with violation of the "long-haul, short-haul" clause of the Interstate Commerce Act, 49 U.S.C.A. § 4(1). Plaintiff's complaint is that an equal charge is made for carriage over a greater distance.

■ The Commission has repeatedly approved the application of blanket rates over wide areas. Extreme examples are the rates on lumber and on citrus fruit, with respect to which blankets have been established throughout the area east of the Mississippi and, in some instances, throughout even larger areas. In its decision in Commodity Rates on Lumber and Other Forest Products, 165 I.C.C. 561, 565, the Commission said: "It is hardly necessary to say that the practice of grouping points of origin or destination and applying the same rate to all points within the group is an outstanding characteristic of the rate structure of the country. This practice has existed from the very beginning and in principle meets with general approval. Such groupings may be actuated in large part by commercial and competitive reasons, as in the case of the great citrus fruit and lumber blankets, or it may be resorted to merely for convenience and simplicity of rate publication. In a multitude of cases we have recognized its necessity and desirability."

The legality of the use by the Commission of such blanket rates was upheld by the Supreme Court in Illinois Commerce Commission v. United States, 292 U.S. 474, 486, 54 S.Ct. 783, 788, 78 L.Ed. 1381, rehearing denied 293 U.S. 628, 55 S.Ct. 66, 79 L.Ed. 714, where the Court held: "Treating an area as a unit and applying a uniform blanket or group rate within it, as is the common practice with respect to switching rates, is within the competence of the Commission." See also, St. Louis S. W. Ry. Co. v. United States, 245 U.S. 136, 38 S.Ct. 49, 62 L.Ed. 199.

■ The plaintiff contends that the use of minimum rates is unlawful per se. This proposition, as thus broadly stated, clearly cannot be sustained, running—as it does—directly counter to the express grant to the Commission, in Section 15(1) of the Act, 49 U.S.C.A. § 15(1), of power to "determine and prescribe * * * the maximum or minimum, or maximum and minimum, to be charged" whenever the Commission finds the rate then in effect to be unreasonable, unjustly discriminatory, unduly preferential or prejudicial, or otherwise in violation of any provision of the Act. Under this section the Commission can fix the ceiling above which the carrier may not go, and the floor below which it may not go, or it may prescribe the precise rate to be charged.

The Commission has repeatedly exercised the minimum rate power, and its authority in this respect has been fully sustained by the courts. New York v. United States, 331 U.S. 284, 343–349, 67 S.Ct. 1207, 91 L.Ed. 1492; Youngstown Sheet & Tube Co., v. United States, 295 U.S. 476, 55 S.Ct. 822, 79 L.Ed. 1553; Jefferson Island Salt Mining Co. v. United States, 6 Cir., 6 F.2d 315.

■ The plaintiff argues that the use of minimum rates is here made necessary by the preferential rates resulting from the approval by the Commission of different classifications (ratings) within Official and Southern Territories. Its argument proceeds that these mismatched ratings are,

themselves, unlawful; hence the Commission has no power merely to prevent (by the use of minimum rates) any evils which flow from such mismatched ratings but must remove the mismatching by equalizing the rates themselves. This argument, even if otherwise valid, must certainly fall if the major premise (i. e., that the use of different ratings in different territories is unlawful) is false. We think this premise is clearly erroneous.

It would undoubtedly be desirable from many standpoints and, at least apparently, the most equitable practice to require all carriers to adhere to a single mileage scale with the rates increased proportionately to an increase in distance. The Commission has recognized this general proposition in Consolidated Freight Classification, Docket 28310 (1939), and ordered uniformity in classification ratings throughout the country. Even in that proceeding, however, it was fully understood that carriers must still be free to publish exceptions to the classification for application within particular rate territories or on particular lines of railroads. This power to establish classification exceptions is necessary so that rate structures may be adjusted to reflect the needs of commerce in particular areas rather than purely nation-wide considerations. See New York v. United States, supra, 331 U.S. at pages 300, 305, 350, 67 S.Ct. 1207, 91 L.Ed. 1492. The very facts which lead to the exceptions here involved (the severe competition in the south between the rail and motor carriers) serve to emphasize the need for flexibility in the system.

■ There clearly is no express prohibition against the use of minimum rates anywhere in the Act. We can declare their use, here, unlawful only if the resulting rates are in some fashion violative of the Act. The plaintiff asserts that the resulting rates violate Sections 1 through 4 of the Act, 49 U.S.C.A. §§ 1–4, and the National Transportation Policy declared by Congress. 54 Stat. 899, 49 U.S.C.A. notes preceding §§ 1, 301, 901, 1001.

Section 1(5) of the Act requires rates to be just and reasonable; Sections 2 and 3(1) denounce relations of rates which result in unjust discrimination or undue prejudice, or preference, against, or in favor of, persons or places.

While at first glance it must appear unreasonable, discriminatory, etc., to charge the identical rate to both Lynchburg and Danville, despite the 65 miles additional haul to the latter, in stressing the comparison of rates between these two near-border cities the plaintiff overlooks the fact that the problem facing the Commission was that of effecting an adjustment on traffic passing between two major rate territories, each involving many states. In any solution to this problem, mathematical niceties are impossible and border-line discrepancies are perhaps inevitable. Even were we to consider de novo the reasonableness of the rates established in the Commission's orders, we should certainly do so in the light of this highly complex problem and not in the light, merely, of the resulting rates between two border cities.

■■ Our function, however, is much more limited. Whether or not rates prescribed by the Commission are unreasonable, unjustly discriminatory or unduly prejudicial, in violation of Sections 1, 2 and 3 of the Act, have repeatedly been held to be questions, not of law for determination by the courts, but of fact within the cognizance of the Commission. Board of Trade of Kansas City v. United States, 314 U.S. 534, 546, 548, 62 S.Ct. 366, 86 L.Ed. 432; Rochester Telephone Corp. v. United States, 307 U.S. 125, 139-140, 59 S.Ct. 754, 83 L.Ed. 1147; Pennsylvania Co. v. United States, 236 U.S. 351, 361, 35 S.Ct. 370, 59 L.Ed. 616; Illinois Cent. R. R. v. Interstate Commerce Commission, 206 U.S. 441, 455, 27 S.Ct. 700, 51 L.Ed. 1128. Although the Commission's determination is of course subject to judicial review, that review does not consist of trial de novo of these facts, Tagg Bros. v. United States, 280 U.S. 420, 443, 50 S.Ct. 220, 74 L.Ed. 524; Keller v. Potomac Elec. Co., 261 U.S. 428, 442, 43 S.Ct. 445, 67 L.Ed. 731, but (so far as is here material) consists merely of an inquiry to determine whether or not the Commission's findings are sup-

ported by substantial evidence. Assigned Car Cases, 274 U.S. 564, 580-581, 47 S.Ct. 727, 71 L.Ed. 1204; Virginian Ry. Co. v. United States, 272 U.S. 658, 663, 47 S.Ct. 222, 71 L.Ed. 463; Western Chemical Co. v. United States, 271 U.S. 268, 271, 46 S.Ct. 500, 70 L.Ed. 941; United States v. Louisville & N. R. R., 235 U.S. 314, 320, 35 S.Ct. 114, 59 L.Ed. 245. A reading of the Commission's report in the case before us, 273 I.C.C. 33, indicates substantial evidence to support the Commission's findings, and we can find no violations of Sections 1, 2 or 3 of the Act.

■ The language of Section 4 of the Act upon which plaintiff apparently relies is: "It shall be unlawful for any common carrier * * * to charge or receive any greater compensation * * * for a shorter than for a longer distance over the same line or route in the same direction, the shorter being included within the longer distance * * *." 49 U.S.C.A. § 4(1). And yet, as we have already pointed out, the new orders result in not a single instance where a greater charge is made for a shorter than for a longer distance.

The Commission has uniformly held that Section 4 does not prohibit charging to a more distant point the same rate as that to an intermediate point. Birmingham Traffic Bureau v. St. Louis-S. F. Ry. Co., 118 I.I.C. 756; Idaho Commercial Clubs v. Oregon Short Line R. R. Co., 18 I.C.C. 562; Milk Producers' Protective Ass'n v. Delaware, L. & W. R. Co., 7 I.C.C. 92. Our attention has been called to no case in which either the Commission or the courts have held that such a rate contravenes Section 4.

It is true that Section 4(1) provides (following the long-haul, short-haul clause just quoted): " * * * but this shall not be construed as authorizing any common carrier * * * to charge or receive as great compensation for a shorter as for a longer distance * * *." Senator Cullom, on January 10, 1887, in explaining this provision to the Senate, stated: "The declaration * * * does not in terms prohibit the charging as much for a shorter as for a longer distance, but simply with-

holds the legislative sanction from the making of such a charge. This qualifying clause negatives the inference that might possibly be drawn from the language of the section without these words, namely; that an equal charge for a shorter distance is authorized by inference because only a greater charge is prohibited. This qualification, therefore, leaves the question of whether an equal amount can be charged for the shorter distance to be determined by the provisions of the bill to which I have already referred, requiring all charges to be reasonable, and forbidding the giving of an unreasonable preference or advantage to any particular locality." 18 Cong.Rec. 485.

It is thus clear that the charging of the same rate to both Lynchburg and Danville is not violative of Section 4 of the Act, and that section leaves it to the Commission to determine whether such a rate is unreasonable or otherwise violative of other portions of the Act.

■ There is no merit in plaintiff's contention that the Commission's orders are contrary to the National Transportation Policy declared by Congress. Nothing in that broad, general declaration of policy prohibits the establishment of minimum rates found by the Commission, upon an ample record, to meet the several substantive tests of the Act.

■ The plaintiff suggests an alternative method of integrating the rate structures of these two contiguous territories, which method, plaintiff urges, is far more equitable than that approved by the Commission. But we have indicated that we find substantial evidence supporting the findings upon which the Commission's orders are based, and that those orders are in no wise violative of the Act; and there our inquiry must stop. The selection of one of several alternative solutions to such a problem as this, none of these solutions involving any violations of the Act, is solely within the competence of the Commission. See Ayrshire Collieries Corp. v. United States, 335 U.S. 573, 593, 69 S.Ct. 278. We therefore decline the opportunity to point out why we think the Commission's

solution, contained in the present orders, is in fact far more desirable than that suggested by plaintiff.

The plaintiff's petition to set aside and annul the Commission's orders is denied and the plaintiff's action is dismissed.

Dismissed.

PAUL, Chief Judge, and BARKSDALE, District Judge, concur.