**ALLEGHENY LUDLUM STEEL COR-
PORATION et al.**

v.

**UNITED STATES of America and In-
state Commerce Commission.**

Civ. A. No. 70–731.

United States District Court,
W. D. Pennsylvania.

March 18, 1971.

Samuel P. Delisi, Pittsburgh, Pa., Max
O. Truitt, Jr., Washington, D. C., Reed,
Smith, Shaw & McClay, Robert R. Wertz,
Pittsburgh, Pa., Wilmer, Cutler & Pick-
ering, Washington, D. C., for plaintiff.

Gordon E. Neuenschwander, Pitts-
burgh, Pa., William M. Moloney and
James I. Collier, Jr., Washington, D. C.,
for Association of American Railroads.

Houston, Cooper, Speer & German,
Pittsburgh, Pa., Donelan, Cleary & Cald-
well, Washington, D. C., for National In-
dustrial Traffic League.

Richard L. Thornburgh, U. S. Atty.,
Pittsburgh, Pa., John H. D. Wigger,
Dept. of Justice, Washington, D. C.,
Houston, Cooper, Speer & German, Pitts-
burgh, Pa., for defendants.

Dwight L. Koerber, Pittsburgh, Pa.,
for National Ass'n of Shippers.

Before ALDISERT, Circuit Judge,
MARSH, Chief District Judge, and
MILLER, District Judge.

## OPINION OF THE COURT

ALDISERT, Circuit Judge.

The Interstate Commerce Commission
has promulgated mandatory rules gov-

erning the manner in which empty freight cars in the possession of non-owning railroads are to be returned to their owners. Before us is an action brought by fifteen steel producers and the American Iron and Steel Institute[1] seeking to enjoin, annul and set aside the order. We must determine whether the Commission's order is supported by "substantial evidence" and satisfies the statutory test of reasonableness. 49 U.S.C. § 1(14) (a).

The rules under review derive from a lengthy study begun in December, 1963, in which the Commission undertook to ascertain the adequacy *vel non* of the nation's supply of railroad freight cars. There followed on June 1, 1964, an announcement by the Commission's Division Three that there existed "a substantial inadequacy" of freight car ownership among America's railroads. 323 I.C.C. 48 (1964). At the same time, the Commission issued a formal notice of proposed rulemaking, pursuant to Section 1(14) (a) of the Interstate Commerce Act, 49 U.S.C. § 1(14) (a), broadening its inquiry to include all phases of car ownership, utilization, and distribution with a view toward alleviating the car shortage problem.

A seven-year study followed. Thirty verified statements were submitted by interested parties. In response to a verified statement by C. C. Robinson, of the Commission's Bureau of Enforcement, which advocated mandatory observance of car service rules promulgated by the railroad industry,[2] at least twenty corporations and shippers' associations, including the steel plaintiffs, obtained leave to intervene. They filed reply verified statements and were joined by twenty-five railroads, the American Short Line Railroad Association, The Association of American Railroads and many shipping interests. Over eight-five reply verified statements were received.

A hearing before an examiner commenced on March 28, 1967, extended 50 days and produced almost 6,000 pages of testimony. The hearing examiner filed a 63-page report recommending discontinuance of the proceeding. He concluded:

the record does not contain competent evidence upon which to base a conclusion as to the adequacy of freight car ownership; and that the adoption of the proposed car ownership formula, regulations, and car service rules has not been shown to be justified.

Eighteen months thereafter, in August, 1969, Division Three of the Commission reached a contrary conclusion, finding that the railroads lacked an adequate supply of freight cars, and ordering that car service rules 1 and 2 be mandatorily observed in order to increase car ownership by the railroads.[3]

1. The Association of American Railroads, The National Industrial Traffic League and The National Association of Shippers Advisory Boards have been granted leave to intervene in this action.

2. A Code of Car Service Rules was established by the railroad industry more than half a century ago, when the free interchange of cars among rail lines became a widespread practice. In 1916, a Railroad Commission on Car Service was created to expedite observance of these rules by recalcitrant lines. Nonetheless, except for a brief period in 1917 and periodic emergency service orders since, compliance with the rules has remained voluntary. Even when the I.C.C. in 1947 ordered the railroads to file service rules with the Commission, no mandatory observance was required. Thus, the rules have served since their inception largely as guidelines to assist the carriers in their dealings *inter se*.

3. Rule 1:
   Foreign cars, empty at a junction with the home road, must be:
   a. loaded at that junction to or via home rails, or,
   b. delivered empty at that junction to home road, except in instances where Rule 6 has been invoked, or unless otherwise agreed by roads involved.

   Rule 2:
   Foreign empty cars other than those covered in Rule 1 shall be:
   a. loaded to or via owner's rails.
   b. loaded to a destination closer to owner's rails than is the loading station or delivered empty to a short

In February, 1970, the I.C.C. modified its order to permit certain exceptions to the rules and to extend the effective date. In July, 1970, this court issued an order restraining enforcement of the order pending a determination in these proceedings.

■■ At the threshold we are met with certain settled principles of law. Because the decision of the Commission carries a presumption of validity, the plaintiffs have the burden of showing that it is invalid. Waite v. United States, 161 F.Supp. 856, 860 (W.D.Pa. 1958); W. J. Dillner Transfer Co. v. I. C. C., 193 F.Supp. 823, 826 (W.D.Pa.), aff'd., 368 U.S. 6, 82 S.Ct. 16, 7 L.Ed.2d 16 (1961); W. J. Dillner Transfer Co. v. United States, 214 F.Supp. 941, 944 (W.D.Pa.1963). Moreover, in the limited scope of our judicial review of I.C.C. decisions, we defer to the expertise of the Commission and will disturb its orders only if there is no "warrant in the law and the facts for what the Commission has done." Leonard Express, Inc. v. United States, 298 F.Supp. 556, 559 (W.D.Pa.1969). Yourga Trucking, Inc. v. United States, 308 F.Supp. 625, 626–627 (W.D.Pa.1969). In addition, there exists a special statutory standard by which car service rules must be measured: "The Commission may, after hearing * * * establish reasonable rules, regulations, and practices with respect to car service by common carriers by railroads subject to this chapter. * * *" 49 U.S.C. § 1(14) (a).

The Commission's report declares that the rules "are not designed to improve the utilization of freight cars, except insofar as return loading is compatible with the primary objective of increasing availability of cars to the owner." 335 I.C.C. at 294. From this flows the necessary conclusion that the "primary objective" of the rules was to increase the availability of freight cars to the car owning line.[4] Under the caption "Conclusions," the report states that

> there is a continuing freight car shortage which requires affirmative, remedial action at this time. We believe that this situation results from a combination of an inadequate ownership of general purpose type freight cars by respondents as a group and improper utilization of the available freight car fleet. * * * Therefore, we will attempt to supply the solution by requiring mandatory observance of the rules.

335 I.C.C. at 308.

■ To find support for the Commission's action, we turn to what is described as the report's "Findings." We are puzzled that a seven-year study by that Commission, which included a 50-day hearing before an examiner with a record amounting to 6,000 pages, was climaxed by a spartan, one-sentence

---

line or switch loading road for such loading (Car Selection Chart is designed to aid in so selecting cars for loading).

c. delivered empty to the home road at any junction subject to Rule 6.

d. delivered empty to the road from which originally received under load, at the junction where received, EXCEPT that when handled in road haul service, cars of direct connection ownership may not be delivered empty to a road which does not have a direct connection with the car owner.

e. returned empty to the delivering road when handled only in switching service.

4. The report continued:
   Thus, improved utilization will be largely in control of the owner who can then provide for the needs of his shippers for whom the equipment was acquired. The greater availability of owned cars rather than haphazard reliance on the supply of foreign cars will provide the owner with an opportunity to measure more accurately its ownership requirements. It will also permit the owner to maintain the car in a condition suitable for use when it is returned. Enforcement of the rules will shift the responsibility for shortages to the railroad with inadequate ownership and compel such a railroad to increase its fleet and to provide better maintenance for its cars.
   335 I.C.C. at 294.

finding: "Upon further study, we find that respondents as a group [the American railroad industry] lack an adequate freight car supply and fail to furnish adequate freight car service." Paucity of words in an agency's finding does not, of course, render it defective. It does require a reviewing court, however, to subject the report to careful examination in order to decide whether the decision met the appropriate tests. Our examination becomes even more important where, as here, the Commission rejected the detailed report of its examiner with a minimum of explanation. We have previously said:

> The United States Court of Appeals for this circuit has pointed out that as a general rule a Commission's findings should be given much weight in cases in which they have specialized and intimate knowledge of the whole proceedings. However, they point out that a slightly different rule is applicable when a final determination by the Administrative Agency *rejects* the findings of a hearing examiner. It would appear that an examiner's report is not as unassailable as a master and can be reversed by the Commission. The reviewing court while it need not give a trial examiner's findings more weight than they deserve in the light of reason and judicial experience, they should be accorded the relevance that they reasonably command in answering the over-all question whether the evidence supporting the Commission's order is substantial. See In re United Corporation, 3 Cir., 249 F.2d 168.

W. J. Dillner Transfer Co. v. I. C. C., *supra*, 193 F.Supp. at 827–828. Moreover, in the leading case of Universal Camera Corp. v. N. L. R. B., 340 U.S. 474, 493, 496, 71 S.Ct. 456, 468, 95 L.Ed. 456 (1951), setting forth the "substantial evidence" test, the Supreme Court stated:

> [T]he plain language of the statutes [Administrative Procedure Act] directs a reviewing court to determine the substantiality of evidence on the record including the examiner's report. * * *

> * * * * * *

> We do not require that the examiner's findings be given more weight than in reason and in the light of judicial experience they deserve. The "substantial evidence" standard is not modified in any way when the Board and its examiner disagree. We intend only to recognize that evidence supporting a conclusion may be less substantial when an impartial, experienced examiner who has observed the witnesses and lived with the case has drawn conclusions different from the Board's. * * *

■ Although it found a freight car shortage that was "all pervasive" throughout the United States, ostensibly on both owner and non-owner lines, the Commission did not find that the shortage was more acute on the owner lines. Indeed, it is the very hypothesis of the I.C.C.'s conclusion that the shortage extends throughout the industry. The report contained numerous charts and tables relating to car shortages showing a decrease in serviceable cars, a decline of freight car ownership, the incidence of cars off line, and an increase in turn around time (the time required for a consigned car to be unloaded and re-shipped, loaded or unloaded). This may constitute substantial evidence of a general car shortage, but it does not support a specific finding of special car shortages on the owner lines. The requirement that an agency make appropriate findings is not imposed "to insist on formalities and to burden the administrative process with ritualistic requirements," City of Yonkers v. United States, 320 U.S. 685, 692, 64 S.Ct. 327, 331, 88 L.Ed. 400 (1944); rather, it rests upon a recognition that

> [t]he courts cannot exercise their duty of review unless they are advised of the considerations underlying the action under review. * * * [T]he orderly functioning of the process of review requires that the grounds upon

which the administrative agency acted be clearly disclosed and adequately sustained.

SEC v. Chenery Corp., 318 U.S. 80, 94, 63 S.Ct. 454, 462, 87 L.Ed. 626 (1943).

Our concern with the absence of such a finding is similar to that expressed in Palmer v. United States, 75 F.Supp. 63 (D.D.C.1947), in which the Court considered significant the absence of findings "that the public interest in the return of cars to the owning railroads outweighs the public interest in prompt movement of freight waiting shipment at the initial unloading point of the car. * * * There is no finding that the present need for cars is on the owning roads rather than on the hiring roads."

In any event, a requirement for the owner railroad "to increase its fleet" will, of necessity, produce substantial effects on the railroad industry and the shipping public. The record, however, is devoid of evidence which reflects the capacity of the railroad industry to absorb new freight car capital expenditures.[5] The Bureau's main witness, Robinson, testified that he considered the economic impact to be irrelevant to the proceedings. Yet, in the same year that Division Three reversed the trial examiner, the I.C.C. in its Eighty-Third Annual Report, 1969, at 72, concluded that "the general financial condition of railroads may be expected to remain poor, capital expenditures to remain minimal, and reduction in employment extended."

■ Although we do not consider the financial capability of the railroads to be a controlling factor, we do deem it significant; the ultimate effect of the mandatory rules on both the railroad industry and the shipping public cannot be minimized. It is not beyond reason to contemplate that increased railroad capital expenditures would generate increases in shipping costs. Indeed, a witness for the Association of American Railroads testified that the "confusion, lost motion, delayed shipments, wasted car days, and extra car handling which would ensue, would far more than outweigh any benefits which might be achieved." It is elemental to require that a Commission report and order which may necessitate substantially increased capital expenditures in the railroad industry be buttressed with evidence disclosing the financial status of the railroads which will be affected.

Absent isolated endorsements, the shipping public was generally opposed to the mandatory rules.[6] The intervening National Association of Shippers Advisory Boards introduced evidence that the mandatory rules would: reduce operating efficiency; further burden the shipping public already suffering from

5. The Bureau of Enforcement sponsored the mandatory regulation. By brief submitted in the proceedings before the Commission it declared: "It is likely that improvement of car service is going to cost the railroads substantially in investment and expense. The shippers should also be willing to accept the burden of expense which they would also incur."

6. Because the shippers and the railroads normally are adversaries in Commission proceedings, that they are virtually united in opposing the mandatory rules is a phenomenon not without significance. The concept of mandatory rules originated in and was advocated solely by the Commission's Bureau of Enforcement. It was not recommended by the shipping public or railroad industry as a solution to the complex problem of freight car shortage. Of 116 verified statements, support for the Bureau's recommendation came from an isolated sector of American industry, limited by product and geography:

[Those supporting the rules] were witnesses Robinson and Ryder of the I.C.C.; Mr. Hilton of the American Plywood Company, I believe it is verified statement 27; Mr. Manning of Western Wood—the correct name of that is Western Wood Products Association, verified statement 28; and Mr. Hackenson and Mr. Singleton, representing the Public Utility Commissioner of Oregon, and that's verified statement 29 and reply verified statement 30, reply verified statement 84; and, finally, Mr. Heights of the United States Department of Agriculture, verified statement 23, reply verified statement 81.

Oral argument of I.C.C. General Counsel.

shortages of rail equipment; unjustly penalize good faith shippers; work particular hardship on continuous process, fabricating and other industries which utilize inbound cars on outbound shipments; disrupt long-established business practices approved by the Commission built upon the sale of products while in transit; deny to the shipper the right to route his own freight; needlessly increase car handling; and add to transportation costs particularly switching and divert rail traffic to other modes of transportation.

Witnesses for the National Industrial Traffic League, the largest diversified shippers' organization in the United States, testified that, far from advancing effective car utilization, mandatory enforcement would seriously obstruct and undermine railroad car utilization, and that the necessary consequence would be delay, wasteful railroad operations, and disruption of shippers' production and distribution programs.[7]

Finally, the Commission concedes that it will be unreasonable and, indeed, impossible, to expect total compliance with the rules. We are told by the examiner:

> If car service rules are established under authority of section 1(14) (a) of the Interstate Commerce Act they become the rules of the carriers to the same extent as any rate, charge, or

other rule which a regulated carrier is required to adopt against its will.

The need for car service rules to be published in tariffs is said to be proven by the exhibits of record submitted by the Bureau of Operations to show bad practices. The witnesses supporting such publication knew that penalties apply when tariffs are not enforced but did not know the magnitude of such penalties. When it is noted that fines under the Elkins Act are not less than $1,000 and range to $20,000, this lack of knowledge indicates a reckless disregard of consequences. Such disdain is remarkable when it is noted that all of the Bureau witnesses agreed that perfect compliance with car service rules is impossible. One of the witnesses was of the opinion that compliance with the first four car service rules proposed would be good if it was made in 80 per cent of the instances those rules were applicable. In view of such opinion the witness believes that the proposed car service rules should be administered with "strictly controlled flexibility". The latter concept may beguile the imagination but it does not provide a comprehensible standard of enforcement. Imposition of the Elkins Act upon respondents for violation of the rules would not be a reasonable regu-

---

7. It is impossible to reconcile the divergent appraisal of this same data by the Commission and the examiner. The Commission observed:

> While observance of the rules may require some extra switching and short delays, this small inconvenience and perhaps additional expense is a small price to pay for the overall benefit to be derived when originating lines obtain quick return of their system cars which were acquired to satisfy the needs of local shippers.

335 I.C.C. at 295.

> This is to be contrasted with the examiner's evaluation:
> If required by mandatory car service rules to predict routing and destination of individual shipments to be loaded on a specific day the steel companies would be faced with a requirement impossible

to meet. In fact it would not be possible to improve the accuracy of forecasting without drastic changes in processing, storage and marketing practices.

Examiner's Report at 26.

> If the plant is among those where a large proportion of cars used for shipments have arrived under load, the necessary increase in switching would exceed the physical capabilities of the plant and the serving carriers beyond the point of rectification.
>
> \* \* \* \* \*
>
> [T]he weight of the evidence, and arguments based thereon, compel the conclusion that mandatory rules would be of substantial detriment to rail carriers and shippers.

*Id.* at 27.

latory action when it is done with the knowledge that as many as 20 per cent non compliance with the rules constitutes good performance.

Examiner's Report at 24.

The admission that there cannot be complete observance of the mandatory rules is a factor which we may consider in determining the reasonableness of a regulation which is self-styled mandatory. The imposition of statutory penalties could be dependent upon a subjective determination of the field representatives of the Commission, thus depriving those charged with an ascertainable standard of guilt. This deprivation could possibly rise to constitutional proportions. See United States v. L. Cohen Grocery Co., 255 U.S. 81, 89–91, 41 S.Ct. 298, 65 L.Ed. 516 (1921), although it is not necessary for us to reach the constitutional question. We consider the concerns about the "ascertainable standard of guilt" solely in the context of the reasonableness of the proposed regulation.

■ Respecting the expertise of the Commission, and cognizant of the sophisticated, myriad problems facing both the Commission and the railroad industry today, we conclude that the order does not meet the statutory test of reasonableness. Three major deficiencies inhere in the report: (1) a failure to find a specific freight car shortage in the owner-lines; (2) a failure to consider the financial effects upon the owner-lines and the shipping public; and (3) a concession that there cannot be more than 80 per cent enforcement of regulations, the violation of which carries criminal penalties. We do not meet the question of a regulation supported by a record which does not contain a combination of these deficiencies.

Accordingly, we grant plaintiffs' motion to annul and set aside the report and order Ex Parte No. 241 of the Interstate Commerce Commission. An order making permanent the previous interlocutory injunction will issue forthwith.