**FLORIDA EAST COAST RAILWAY COMPANY, a corporation,**
**Plaintiff,**
and
Southern Pacific Transportation Company, a corporation, Northwestern Pacific Railroad Company, a corporation, and San Diego & Arizona Eastern Railway Company, a corporation, Intervening Plaintiffs,

v.

**UNITED STATES of America and Interstate Commerce Commission,**
**Defendants.**

**No. 70–182–Civ–J.**

United States District Court,
M. D. Florida,
Jacksonville Division.

June 7, 1971.

Walter G. Arnold, Arnold & Stratford, Jacksonville, Fla., A. Alvin Layne, Kim D. Mann, Washington, D. C., for plaintiff.

Delbridge L. Gibbs, John W. Caven, Jr., Marks, Gray, Yates, Conroy & Gibbs, Jacksonville, Fla., John Mac-Donald Smith, Albert T. Suter, San Francisco, Cal., for intervening plaintiff.

Walker B. Comegys, Acting Asst. Atty. Gen., John H. D. Wigger, Atty., Dept. of Justice, Washington, D. C., John L. Briggs, U. S. Atty., John Roberts, Asst. U. S. Atty., Jacksonville, Fla., Robert W. Ginnane, Gen. Counsel, Fritz R. Kahn, Trial Atty., Office of the Gen. Counsel, Jerome Nelson, Atty., I. C. C., Washington, D. C., for defendants USA and ICC.

Before SIMPSON, Circuit Judge, and SCOTT and TJOFLAT, District Judges.

## MEMORANDUM OPINION AND FINAL JUDGMENT

SIMPSON, Circuit Judge:

This action was brought by Florida East Coast Railway Company (FEC) supported by the intervening lines (Southern Pacific or Southern Pacific Group) under Title 28, U.S.C., Sections

2321–2325 and 2284, to enjoin, annul, and set aside orders of the Interstate Commerce Commission (ICC or Commission) which require the railroads, in accordance with an ICC-imposed formula, to file annual reports concerning their respective ownership of general purpose freight cars and to observe mandatory freight car service rules. The orders are based on investigations by the Commission in Commission docket number Ex Parte No. 241, styled Investigation of Adequacies of Railroad Freight Car Ownership, Car Utilization, Distribution, Rules and Practice. The proceedings before the Commission are reported at 335 I.C.C. 264, modified in 335 I.C.C. 874.

The Florida East Coast Railway Company (FEC) commenced this action by a complaint which attacks both the car ownership formula upon which the affected railroads are required to submit information to the Commission and the imposition of the mandatory car service rules. The Southern Pacific Group of railroads intervened as plaintiffs in the case and also attack both the car ownership formula and the mandatory car service rules as an arbitrary and capricious exercise of Commission power.

For years the Commission has been concerned with recurring complaints by shippers and Congress that there existed a national shortage of railroad freight cars. See, e. g., 268 I.C.C. 687 (1947). Early in the Commission's investigation it concluded that the problem would best be solved by committing it to the sound discretion of the management of the various railroads. In the early 1960's however, as the problem continued to be acute, the Commission issued its order July 29, 1964, in Docket Number 241, supra, to obtain detailed information regarding car ownership, utilization, distribution, rules, and practices which might bear on the alleged railroad car shortage. The railroads were ordered to file the requested information on forms provided by the Commission. The evidence was submitted to the Commission in the form of these reports, verified statements of the railroads and shippers, and in an evidentiary hearing before a hearing examiner, requiring 50 hearing days to receive testimony and 120 Exhibits, and resulting in a transcript running to 5804 pages. On January 23, 1968, the hearing examiner filed his report asserting that the record did not contain competent evidence upon which to base a conclusion as to the adequacy of freight car ownership, and that the adoption of car ownership formula and car service rules had not been shown by the record to be justified.

Exceptions were filed to the hearing examiner's report, and Division 3 of the Commission overruled the hearing examiner, finding from the evidence adduced and official notice taken of congressional hearings, as well as from complaints to the Commission by shipper's and studies inside and outside the Commission, that rail car shortages were largely the result of inadequacies in the ownership and utilization of freight cars. 335 I.C. C. 308–309. Division 3 for the Commission adopted a car ownership formula by which the railroads were to help assess the adequacy of the number of cars owned by each railroad. Each railroad was ordered to submit to the Commission reports showing the application of the adopted formula, and to report to the Commission what steps had been taken to cure the deficiencies indicated by the application of the formula, if any, or to provide reasons why such steps were not taken. The Commission also ordered that Car Service Rules 1, 2, 7, 15, 16, 17 and 18, which had earlier been adopted by the American Association of Railroads for voluntary observance, be made mandatory on the railroads.

On review of the action of Division 3 by the entire Commission, the Division decision was affirmed with Rule 19 (which prescribes the procedure for obtaining exceptions to the car service rules) also made mandatory. In other respects the full Commission affirmed the Division action. The Commission

made July 1, 1970, the effective date for complying with the orders.

FEC filed its complaint on April 8, 1970. On June 5, 1970, the United States and the Commission filed a motion to dismiss the FEC complaint on grounds of lack of jurisdiction over the subject matter and of failure of the complaint to state a claim upon which relief could be granted. Southern Pacific then on June 22, 1970, moved to intervene and filed a motion for temporary restraining order against the car service rules portion of the Commission's order. On June 24, 1970, a temporary restraining order was issued by a single judge of this court preventing enforcement of Car Service Rules 1 and 2 pending adjudication of the merits by this court.[1] The government's motion to dismiss the action was deferred by the single judge for consideration by the full three-judge panel.[2]

## THE CAR OWNERSHIP FORMULA

The formula approved by the Commission is an interline car-day formula. The formula contemplates that the car ownership requirements of the railroads will be determined by (1) computing the number of serviceable cars required to protect traffic actually carried by dividing serviceable car-days of cars on line by the number of days in October, the computation period; (2) computing the number of serviceable cars required to protect shortages by multiplying the reported shortages in October (reduced by 50%) allocated between local and inter-

line on the basis of car loadings by the computed local turnaround time (serviceable car-days divided by carloads originated in local service) and by the national average turnaround time for interline service; and (3) computing the effect of the credit allowed to railroads loading foreign cars in October for interline movement.

It is the position of FEC that the car ownership formula is arbitrary and capricious as applied to the FEC, and discriminates against the FEC because of its position as a terminating line. As a stub end road running the length of the Florida peninsula along the east coast from Jacksonville to Miami, FEC terminates substantially more carloads of interline freight than it originates. This FEC area originates mainly fruit and vegetable shipments, handled by refrigerated cars and does not produce a substantial volume of traffic involving products capable of loading into ordinary boxcars, the type of cars mainly used for the shipment of commodities into Florida. As a consequence FEC claims that it is habitually burdened with a substantial excess of foreign freight cars over the number required for loadings.

FEC states that while the Commission did not admit into evidence at the hearing any data applying the formula to particular railroads, independent study by the American Association of Railroads indicates that application of the formula to FEC will result in a finding that FEC has a car ownership shortage

1. On May 12, 1971, while the case was under submission to the court, pursuant to a motion by FEC a member of this court also granted a temporary restraining order staying the enforcement of the Commission order requiring the FEC to submit data to the Commission in accordance with the car ownership formula pending hearing by the full court on the merits of the cause. At oral argument counsel agreed that both temporary stays should continue in force pending our decision on the merits.

2. This opinion and our order are based on the record before us and not on out-

side material, but we note that a recent book critical of the ICC, entitled The Interstate Commerce Omission, authored by the Ralph Nader Study Group, contains a chapter dealing with alleged boxcar shortages. For further insight into the boxcar shortage controversy, reference may be made to an opinion rendered by a three-judge court of this district in a companion case, Florida East Coast Railway Company v. United States and Interstate Commerce Commission, 322 F.Supp. 725 (1971).

of some 2,053 freight cars. FEC contends that its purchase of these additional cars would require an expenditure in excess of 28 million dollars.

The crux of FEC's complaint is then that the formula as presently approved is arbitrary because it fails to take into consideration the special operational problems of a terminating railroad. FEC contends that the application of this formula will result in a completely unwarranted but predictable finding that the FEC is deficient in the ownership of railroad freight cars, and that the FEC will then be required to expend millions of dollars for cars which it cannot load and for traffic in which it cannot participate. FEC contends for example that the major freight car shortages occur in October when the West and Midwest grain harvests take place. FEC notes that Florida produces little grain which is loaded into general purpose freight cars, and that little grain from the West and Midwest is shipped over FEC lines for export, consumption or processing. FEC further points out that it does not participate in the shipment of coal, another industry which the Commission cited as suffering from a car shortage. The FEC states moreover that it will be totally unable, as a terminating line (as opposed to an essentially originating line) to load with freight for out shipment the cars which the present formula will require it to purchase. The further argument goes that under the companion mandatory car service rules to be discussed infra, the FEC will not be able to require that the other railroads accept empty FEC cars for loading. Thus FEC argues that the mandatory car service rules further complicate the problem. FEC lastly contends that because of the peculiar application of the formula definitions of "serviceable car-days" and "turnaround time" to a terminating line, the FEC's inability to load the cars will result in an even greater showing of deficiency under the formula here attacked. This is said to point up the ludicrous nature of the formula since in this instance the fewer cars the FEC uses, the more cars the formula will operate to require it to purchase. These factors are the principal bases from which FEC argues that the formula is arbitrary and unreasonable in that it will result in a required purchase of millions of dollars of unneeded and unusable freight cars.

FEC also urges that the action of the Commission in reversing the examiner was based on matters outside the record which FEC had no opportunity to contest or cross-examine. This argument is bottomed largely upon this statement in the Commission order at 335 I.C.C. 308:

From the evidence adduced, and official notice taken from Congressional hearings, numerous complaints by shippers to the Commission, and numerous studies made in and outside the Commission, we are convinced that there is a continuing freight car shortage which requires affirmative remedial action at this time. We believe that this situation results from a combination of inadequate ownership of general purpose type freight cars by respondents as a group, and improper utilization of the available freight car fleet.

FEC contends that it has no way to ascertain from this Commission statement what materials were the subject of Commission notice, and further that it was given no opportunity to rebut the materials, in the face of the requirement of the Administrative Procedure Act that where rule-making is involved a party is entitled to an opportunity to rebut materials of which official notice is taken. Title 5, U.S.C., Section 556(d).

On oral argument counsel for the Commission placed this action in perspective by pointing out that the Commission proceeding under review in this action is one of a number of related proceedings in which the Commission has attacked the problems of car supply and distribution. We were referred to Commission hearings on basic car per diems, Docket Number 31,358, found at 332 I.C.C. 176. The ICC order was up-

held by two 3-judge courts: Union Pacific Railroad Co. v. United States, D. Neb.1969, 300 F.Supp. 318 and Boston & Maine Railroad v. United States, D. Mass.1969, 297 F.Supp. 615. Both decisions were affirmed by the United States Supreme Court at 396 U.S. 27, 90 S.Ct. 196, 24 L.Ed.2d 142. Commission proceedings were also held relative to the imposition of the incentive car per diems, Docket Number 252, Sub. 2, 337 I.C.C. 217, in response to the 1966 Congressional amendment to Section 114 of the Interstate Commerce Act. That proceeding was attacked and held invalid in a companion case before this Court. See footnote 2. A 3-judge statutory court of the Eastern District of New York reached the opposite conclusion in Long Island R. R. Co. v. United States, 318 F.Supp. 490. *Long Island* was not appealed but the Middle District of Florida case is presently on appeal to the Supreme Court. A third proceeding involved Commission action to require consignees to clear and clean cars properly after use. This Commission directive is under attack in the district court for the District of Minnesota, in a case styled A. E. Staley Manufacturing Company v. United States and Interstate Commerce Commission, 310 F.Supp. 485. The Commission in the past several years has also entered numerous Car Service orders dealing with specific emergency situations which were from time to time found to exist.

We agree with Commission counsel that it should have been obvious to all the affected railroads and to all others involved in the proceed'ngs under review that the "numerous studies" referred to in the Commission order related to these other proceedings being conducted by the Commission, aimed at other aspects of the car shortage problem. The Commission citation of these other proceedings was merely additional support for a proposition which already is clear in this record; that is, the United States has long suffered from a shortage of railroad freight cars. The numerous Commission proceedings directed at alleviating or correcting the freight car shortage were common knowledge in the railroad industry.

■ The FEC argument that they were prejudiced by the Commission reference to some mysterious source which evades the FEC is found to be not meritorious.

The record indicates that the Commission's Bureau of Accounts and its Bureau of Inquiry and Compliance (whose title was later changed to Bureau of Enforcement) understood and urged that the present formula might work a hardship on terminating lines. The Bureaus' brief to the Commission stated:

Implementation of an interline car-day theory of ownership responsibility would require railroads whose interline traffic is predominately terminations or overhead to increase their ownership in excess of their originations and would probably require some centralized national control of distribution, perhaps as firm and arbitrary as that employed by the Director General in distributing the national pool under World War I to assure equitable utilization of the excess ownership. (Bureau brief p. 51)

FEC contends that despite this warning the Commission failed to make adequate provision for the plight of the terminating railroad. Instead, the FEC charges that the Commission in attempting to remedy the Bureau's objection adopted a patently discriminatory "car service compliance credit" that further penalizes the FEC by imposing additional car ownership requirements because of the inability of the FEC to load empty foreign cars on its line.

In instituting the interline formula the Commission found:

Both the Bureau of Accounts and the AAR directors advocate use of a so-called interline car-day formula which, in addition to providing sufficient ownership to protect a carrier's origination in local service, would insure that each railroad owns cars in numbers equal to its proportionate use of

the national fleet in interline service. It is concluded that this type formula is equitable because interline service is a profit venture in which all roads participate to the extent of their proportionate use of the freight car fleet. Since an interline formula will be the most equitable means of establishing car ownership requirements, we shall give no further consideration to the formula designed by the Bureau of Accounts which is based mainly on loads originated and which is shown in appendix D to the examiner's report. (335 I.C.C. at 304-05)

FEC argues however that the Commission's findings are without support in the record, contending that the approved formula does not insure that each railroad will own cars in numbers equal to its proportionate use of the national fleet in interline service. Rather, they say, the terms of the credit provision of the formula insure that terminating lines will supply a disproportionate share of the freight cars used.[3]

The Commission replies to all of this by requesting the court to dismiss the action for lack of ripeness. The Commission charges that at this time the formula is in a tentative and experimental stage without any substantial impact on the railroads. The ICC argues that for the present it considers the formula simply a rough guideline to the railroads of what the Commission believes each railroad's ownership requirements should be, and that neither FEC nor any other line has been actually ordered to purchase a single freight car in accordance with the formula. At this stage ICC says it merely requires that the railroads supply data showing hypothetical application of the formula, not dissimilar to information which the railroads are now supplying to the American Association of Railroads. Commission counsel on brief and in oral argu-

ment asserts that the Commission recognizes imperfections in the present formula and that further modifications will likely be necessary and further studies required before settling on a formula equitable in application to all railroads. Since the formula may be expected to undergo substantial changes before it is adopted in final form and because no purchases of railroad cars by any line in accordance with any formula have yet been required, ICC asserts that the lack of administrative finality renders the controversy not yet ripe for judicial intervention.

The FEC replies that Frozen Food Express v. United States, 1956, 351 U.S. 40, 76 S.Ct. 569, 100 L.Ed. 910, is conclusive authority for the proposition that the Commission's action with respect to the car ownership formula is now ripe for adjudication under Section 17(9) of the Interstate Commerce Act, Title 49, U.S.C., Section 17(9).

█ We think, however, that the FEC misapplies the holding of *Frozen Food Express*. There the holding by the Court was that a finding by the Commission that a commodity was not an exempt agricultural product had "immediate and practical impact" on carriers who were transporting the commodity because transportation of such commodity without Commission approval subjected the carrier to a broad assortment of sanctions. As explicated above, the order in Docket 241 presently requires no more than that the railroads file reports in accordance with the approved formula. Beyond cavil the Commission has the authority to require the filing of such reports under the provisions of Section 20(1) of the Interstate Commerce Act, Title 49, U.S.C., Section 20(1) which reads:

"The Commission is hereby authorized to require annual, periodical, or special reports from carriers, lessors, and associations (as defined in this

---

3. FEC's apparent position is that any formula designed by the Commission for measuring freight car shortage of respec-

tive lines should be based primarily on the number of freight loads originated on each line.

section), to prescribe the manner and form in which such reports shall be made, and to require from such carriers, lessors, and associations specific and full, true, and correct answers to all questions upon which the Commission may deem information to be necessary, * * * "

The carrier railroads at this time suffer no "immediate and practical impact" from the order apart from being required to file reports within the scope of Commission authority under the statute. This case more nearly partakes of the nature of a case distinguished in *Frozen Foods*: United States v. Los Angeles & S. L. R. Co., 1927, 273 U.S. 299, 47 S.Ct. 413, 71 L.Ed. 651. In *Los Angeles & S. L. R. Co.* the Supreme Court held nonreviewable a Commission report which "might never be the basis for a proceeding before the Court". This latter statement is strikingly reminiscent of the case at hand, where the Commission acknowledges that its provisional formula is less than perfect and may require modification to meet the objections of particular carriers. It is conceivable that the formula in its present state will never be the basis for a Commission order actually to purchase freight cars. Our mission as an Article III court is to decide actual cases or controversies, not potential cases or controversies. We should not decide cases where the orders of the Commission have no "immediate and practical impact" on the carrier, and where further action within the agency might avoid the predicted dispute altogether. We find nothing in Columbia Broadcasting System v. United States, 1942, 316 U.S. 407, 62 S.Ct. 1194, 86 L. Ed. 1563, and Gardner v. Toilet Goods Association, 1967, 387 U.S. 167, 87 S.Ct. 1526, 18 L.Ed.2d 704, which is inconsistent with this conclusion. We therefore find that the agency action lacks the degree of finality requisite to judicial review and accordingly grant the motion of the United States and the Commission to dismiss this action insofar as it relates to the car ownership formula, without prejudice to the right of FEC or the Southern Pacific Group to seek relief in court at such time as an actual controversy has ripened.

## MANDATORY CAR SERVICE RULES

In this portion of the suit the FEC and the Southern Pacific Group attack the imposition of mandatory car service rules as being without sufficient support in the record.[4] The Commission contests this assertion, and we find no basis for us to set aside the action of the Commission in requiring mandatory observance of the car service rules already in effect by voluntary agreement.

Car service rules were not invented by the Commission. They were initially devised by the railroads' trade organization, the Association of American Railroads, to secure the prompt and expeditious use of freight cars. There was a dispute at oral argument between opposing counsel as to the extent to which the railroads were bound by the rules promulgated by the Association of American Railroads, but it seems to us clear that the railroads entered into an agreement to abide by and to enforce the car service rules.

The Commission contends that if the railroads had only lived up to their agreement to operate in accordance with the voluntary car service rules, further Commission action in this regard would be unnecessary. However, the Commission contends that the rules were ob-

---

4. Although the plaintiff and intervenors challenge all of the mandatory car service rules, on brief and at oral argument their attention focused almost entirely on Car Service Rules 1 and 2. Car Service Rule 1 provides generally that cars of other ownership in possession of a railroad at a junction or common point with the owner must be delivered empty to the owner, or shall be loaded at that point to or via the owner's line. Car Service Rule 2 applies to foreign cars which are unloaded elsewhere and provides that the foreign car shall either be returned empty to the owner, delivered empty to the road from which the car was received under load, or may be loaded to or via the owner's line.

served more in the breach than in the compliance. Hence the Commission contends that the mandate to observe the car service rules is simply a Commission effort to put teeth in regulations which the railroads themselves recognized long ago as necessary to the efficient movement of rail traffic. Further the Commission cites numerous verified statements by shippers and railroads during the proceedings before the Commission which in varying manners expressed the need for better enforcement of the car service rules.[5]

■ Review of the evidence indicates that considerable testimony was presented on both sides of the question. Certainly all witnesses were not in agreement as to the advisability of instituting mandatory car service rules. If we had initial reponsibility for decision of this case we might or might not weigh the evidence in the same manner or reach the conclusion reached by the Commission. Our review under the Administrative Procedure Act, Title 5, U.S.C., Section 706, is limited to ascertaining whether there was substantial evidence in the record for the Commission decision. We find no difficulty in determining that the Commission action was based on substantial evidence.

■ That the mandatory car service rules do not by themselves correct all of the car shortage problems is irrelevant. The Commission recognized that the car shortage issue presented problems of gargantuan dimensions requiring attack across a wide front. The Commission stated at 335 I.C.C. 294:

* * * They are not designed to improve the utilization of freight cars, except insofar as return loading is compatible with the primary objective of increasing availability of cars to the owner. Thus, improved utilization will be largely in control of the owner who can then provide for the needs of his shippers for whom the equipment was acquired. The greater availability of owned cars rather than haphazard reliance on the supply of foreign cars will provide the owner with an opportunity to measure more accurately its ownership requirements. It will also permit the owner to maintain the car in a condition suitable for use when it is returned. Enforcement of the rules will shift the responsibility for shortages to the railroad with inadequate ownership and compel such a railroad to increase its fleet and to provide better maintenance for its cars. If a railroad has assurances that it can secure frequent and repeated loadings of its own cars, and if it is prohibited for indiscriminate use of misloading on someone else's cars, it will tend to correct any ownership deficiencies it may have. Moreover, once it is in a position to know what ownership levels it must maintain, it will also be able to justify the investment required.

We take due note of the decision of the statutory 3-judge district court in Allegheny Ludlum Steel Corporation v. United States and Interstate Commerce Commission, 325 F.Supp. 352, W.D.Pa. 1971, which found that the imposition of mandatory car service rules did not meet the reasonableness requirements of Title 49, U.S.C., Section 1(14) (a). That court found that the Commission order was deficient primarily in that it failed to contain a finding of specific freight car shortage in the owner lines, and secondly because the Commission conceded that it would be unreasonable to expect total compliance with the mandatory car service rules.

5. Record references include: Boston and Maine verified statement 7, page 30; Great Northern verified statement 19, pages 2–3; Missouri Pacific verified statement 11, page 3; Norfolk and Western verified statement 15, page 10; Northern Pacific verified statement 16, pages 6, 12, 13; Penn Central verified statement 17, page 11; National Industrial Traffic League verified statement 25, page 9; American Short Line Railroad Association verified statement 22, page 11; American Plywood Association verified statement 27, page 10.

■ With deference to the court deciding it, we think the holding in that case was wrong. We decline to follow it. In the first place we view the Commission explanation of the imposition of the rules, supra, as demonstrating that the *Allegheny Ludlum* court missed the point in faulting the Commission for failure to make a specific finding of a shortage in railroad cars on the owner lines. The Commission did make a finding, acknowledged in fact by the Pennsylvania court, that the freight car shortage was *all pervasive* throughout the United States. Considering this finding and the expertise which is committed to the Commission in governing interstate carriers, we think that the Commission acted lawfully in instituting an equitable policy which during a freight car shortage would operate to reward the owner lines by giving them maximum use of the cars in which they had invested. Put another way, the mandatory car service rules are basically undergirded by the proposition that when a shortage of freight cars arises, the effect of the shortage should bear most heavily on the railroads which have failed to purchase an adequate car supply. The question is not, as the Pennsylvania court posed it, whether the shortage on the owner lines is more acute, but rather who should get first call on the use of cars during a shortage. Correctly stated then, we view the question as properly answered in the policy decision of the Commission to institute rules which would provide the greater usage to the owner lines.

The other major objection which the *Allegheny Ludlum* court raised to the mandatory car service rules was the Commission acknowledgment that a number of exceptions would be required daily to insure the proper flexibility in the use of rail cars. The Pennsylvania court reasoned that this admission that full compliance was impossible coupled with the possibility of criminal sanctions for non-compliance rendered the mandatory nature of the car service rules unreasonable. We disagree. The Commis-

sion likewise tells us that full compliance cannot be expected. We think that this is really nothing more than recognition that it is a rare rule which has no exceptions in practical application.

■ That the Commission recognizes that the most efficient use of rail cars in some specific situations might require exceptions to the rules does not mean that the Commission cannot *reasonably* proceed from a mandatory rule where, as here, proper machinery has been established for the allowance of those exceptions. To insure that the exceptions do not swallow the rules and to assure a national policy on the granting of exceptions, the Commission has established a national service to which the railroads will submit requests for exceptions from the rules. The plaintiff and intervening roads claim that the Commission Bureau is far too under-staffed to handle all of the numerous daily requests for exceptions that will be produced in the fast-moving railroad business. We do not minimize the seriousness of this problem, but we think that it is a matter of administrative detail which can be left to the Commission to handle as procedures are developed for expeditious handling of requests for exceptions. These relatively minor "rough edges" on the Commission's plan should not be allowed to upset what we think is an otherwise reasonable agency plan to attack one phase of freight car shortages.

We therefore find the reasoning of the *Allegheny Ludlum* court unpersuasive. Our independent examination of the issue leads us to conclude that the mandatory car service rules constitute a reasonable exercise of Commission power, based upon substantial and sufficient evidence in the record before the Commission.

In consideration of the foregoing,

It is ordered:

1. This action is dismissed without prejudice as it pertains to relief from the car ownership formula.

2. The petitions for relief, enjoining, annulling and setting aside the mandato-

ry car service rules are in all respects denied.

3. The temporary restraining orders entered by Judge McRae on June 24, 1970, and by Judge Simpson on May 12, 1971, enjoining enforcement of the Commission orders pending determination of this action are continued in effect for a period of 20 days following the date hereof, to permit an application to the Supreme Court of the United States or a Justice thereof for a temporary further stay in connection with appeal. Upon the expiration of said 20 days our temporary restraining orders are vacated and set aside.

4. This Memorandum Opinion and Judgment shall constitute the Final Judgment of this Court as to all issues presented in this action.