569 F.2d 196
 FORD MOTOR COMPANY, Petitioner in No. 77-1977,
v.
UNITED STATES of America and Interstate Commerce Commission,
Respondents,
Rocky Mountain Motor Tariff Bureau, Inc., Southern Motor
Carriers Rate Conference, Inc., Middle Atlantic
Conference, Intervenors.
The NATIONAL INDUSTRIAL TRAFFIC LEAGUE, Petitioner in No. 77-2093,
v.
UNITED STATES of America and Interstate Commerce Commission,
Respondents,
Middle Atlantic Conference, Southern Motor Carriers Rate
Conference, Inc., Intervenors.
JONES TRANSFER COMPANY, Central Transport, Inc., Earl C.
Smith, Inc., Inter-City Trucking Service, Inc., Ogden &
Moffett Company, U. S. Truck Company, Inc., and White Star
Trucking Inc., Petitioners in No. 77-2095,
v.
UNITED STATES of America and Interstate Commerce Commission,
Respondents.
 Nos. 77-1977, 77-2093 and 77-2095.
 United States Court of Appeals, Third Circuit.
 Argued Dec. 6, 1977.
Decided Dec. 29, 1977.
 
 John H. Shenefield, Acting Asst. Atty. Gen., Bruce E. Fein, Atty., Dept. of Justice, Washington, D. C., Mark L. Evans, Gen. Counsel, Frederick W. Read, III, Associate Gen. Counsel, Ellen K. Schall, Atty., I. C. C., Washington, D. C., for the Interstate Commerce Commission and the United States.
 David R. Larrouy, Harry Gibson, Ford Motor Co., Dearborn, Mich., Jack R. Turney, Jr., Robert R. Redmon, J. William Cain, Jr., Washington, D. C., for petitioner Ford Motor Co.
 
 
 1
 John F. Donelan, Frederic L. Wood, Renee D. Rysdahl, Donelan, Cleary, Wood & Maser, Washington, D. C., of counsel, Dennis J. Helfman, Detroit, Mich., for the Nat. Industrial Traffic League.
 
 
 2
 William E. Kenworthy, Gerald W. Hess, Denver, Colo., for Rocky Mountain Motor Tariff Bureau, Inc.
 
 
 3
 Robert E. Born, Atlanta, Ga., of counsel, Born & May, P. C., Atlanta, Ga., for Southern Motor Carriers Rate Conference, Inc.
 
 
 4
 Bryce Rea, Jr., Patrick McEligot, Washington, D. C., of counsel, Rea, Cross & Auchincloss, Washington, D. C., for Middle Atlantic Conference.
 
 
 5
 Before ALDISERT and WEIS, Circuit Judges, and CHRISTENSEN, District Judge.*
 
 OPINION OF THE COURT
 
 6
 PER CURIAM.
 
 
 7
 Various petitions for review have been consolidated to present the question whether certain orders of the Interstate Commerce Commission in Ex-Parte No. MC-88, Detention of Motor Vehicles Nationwide, 124 M.C.C. 680 (1976); 126 M.C.C. 803 (1977), reflect conclusions that "are rationally supported", United States v. Allegheny-Ludlum Steel Corp., 406 U.S. 742, 749, 92 S.Ct. 1941, 32 L.Ed.2d 453 (1972). Because we are persuaded that there is a rational basis for the ICC conclusions, we will deny the relief sought in the petitions for review.
 
 
 8
 The Ford Motor Company (No. 77-1977) petitioned this court for judicial review of the Commission's reports and orders in Ex-Parte No. MC-88, dated May 25, 1976, June 3, 1977, and September 15, 1977. The National Industrial Traffic League (NITL) (No. 77-2093) and the Jones Transfer Company (No. 77-2095), a group of seven motor common carriers, filed petitions for review in the District of Columbia and the Sixth Circuits, respectively. Both of these petitions were transferred to this court pursuant to 28 U.S.C. § 2112(a). The Rocky Mountain Motor Tariff Bureau, the Middle Atlantic Conference and the Southern Motor Carriers Rate Conference, Inc., have intervened as respondents in the litigation.
 
 
 9
 The orders under attack promulgate uniform nationwide motor truck and trailer detention regulations providing for prearranged scheduling and detention charges for vehicles with and without power. The rules are separate from and independent of the line-haul transportation charges. In general, the rules provide for and define free and chargeable detention time of vehicles with power (trucks and tractors) as well as vehicles without power (trailers). The basic purpose of the rules, according to the ICC, is to discourage undue delay of motor carrier equipment by shippers and their representatives. According to the Commission, non-uniform detention rules, published by all the major rate bureaus and the individual rate carriers, contain numerous, highly specific exceptions which can act as a subterfuge for creating preferences, concessions and rebates.
 
 
 10
 The orders appealed from emanated from lengthy rule-making proceedings that began on June 22, 1973, and culminated in a report and order dated May 25, 1976, a report and order on reconsideration dated June 3, 1977, and an order granting petitions for reconsideration and modification dated September 15, 1977. The Commission rules provide for detention of motor vehicles with and without power and vest in the consignees or consignors of freight the discretion to decide where carriers can detach their power units. The rules define spotting as "the placing of a trailer at a specific site designated by consignor, consignee or other party designated by them, detaching the trailer, and leaving the trailer in full possession of consignor, consignee, or other designated party unattended by carrier's employee and unaccompanied by power unit." § 2(f), 124 M.C.C. at 793. The rules further provide, inter alia, that the consignee or the consignor may designate any site on its premises, including the loading dock, as the place to spot trailers, and may provide "holding yards" on their premises for parking trailers. Additionally, the rules state that when a carrier's line-haul obligation ends, the cost of moving the trailers to the loading dock is the responsibility of the consignee or consignor.
 
 I.
 
 11
 Ford and Jones Transport challenge only the orders regulating the detention of trailers. The NITL challenges not only these orders, but also the Commission's findings regarding the charges and the burden of proving responsibility for delay of carrier equipment.
 
 
 12
 Ford argues that the orders were arbitrary, capricious, and not in accordance with law, and that insofar as they restrict the legal line-haul responsibility of the common carrier by motor vehicle, the orders are unsupported by substantial evidence. Jones Transport contends that the Commission acted arbitrarily and capriciously (a) in failing to relate the ban on holding yard operations to any interest of the shipping public in reducing detention of motor vehicles, and in requiring without justification a conversion of carrier operations to inefficient pick up and delivery methods; (b) in attempting to redefine the scope of line-haul motor carrier service without analyzing the function of holding yards in providing such service, the past history and precedents relating to such service, and the historic equities between motor common carriers and other transportation modes; (c) in barring all motor common carrier participation in inbound switching of trailers; and (d) in barring carrier switching operations in the delivery of freight at destination, while allowing switching in the pick up of freight at origin.
 
 
 13
 NITL contends that the ICC abused its discretion by prohibiting motor common carriers from switching loaded trailers from holding yards to unloading facilities as part of their line-haul obligation, arguing that it arbitrarily and capriciously ignored evidence of record which established that trailer pools are mutually beneficial to shippers and carriers and are not a concession to large shippers and, moreover, that the rule requiring common carriers to deliver freight short of the consignees' unloading facilities is inconsistent with applicable law. NITL also contends that the ICC arbitrarily and capriciously established a uniform detention charge without reference to motor carrier costs or the purposes which the charge is intended to serve, and that the shift in the burden of proving responsibility for delay of carrier equipment is inconsistent with the nature and purpose of detention.
 
 II.
 
 14
 The starting point for judicial review of the ICC orders is 5 U.S.C. § 706(2) (A): "The reviewing court shall . . . hold unlawful and set aside agency action, findings, and conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law . . . ." But we do not write on a clean slate in fashioning a construction of what is arbitrary and capricious in the context of reviewing ICC rulemaking functions. The Supreme Court has specifically and definitively addressed this aspect of statutory construction, and has formulated a scope and standard that severely limits the extent of judicial review:
 
 
 15
 The standard of judicial review for actions of the Interstate Commerce Commission in general, Western Paper Makers' Chemical Co. v. United States, 46 S.Ct. 500, 70 L.Ed. 941, 271 U.S. 268 (1926), and for actions taken by the Commission under the authority of the Esch Act in particular, Assigned Car Cases, 274 U.S. 564, 47 S.Ct. 727, 71 L.Ed. 204 (1927), is well established by prior decisions of this Court. We do not weigh the evidence introduced before the Commission; we do not inquire into the wisdom of the regulations that the Commission promulgates, and we inquire into the soundness of the reasoning by which the Commission reaches its conclusions only to ascertain that the latter are rationally supported. In judicially reviewing these particular rules promulgated by the Commission, we must be alert to the differing standard governing review of the Commission's exercise of its rulemaking authority, on the one hand, and that governing its adjudicatory function, on the other:
 
 
 16
 "In the cases cited, the Commission was determining the relative rights of the several carriers in a joint rate. It was making a partition; and it performed a function quasi-judicial in its nature. In the case at bar, the function exercised by the Commission is wholly legislative. Its authority to legislate is limited to establishing a reasonable rule. But in establishing a rule of general application, it is not a condition of its validity that there be adduced evidence of its appropriateness in respect to every railroad to which it will be applicable. In this connection, the Commission, like other legislators, may reason from the particular to the general." Assigned Car Cases, supra, at 583, 47 S.Ct. at 734.
 
 
 17
 United States v. Allegheny-Ludlum Steel Corporation, supra, 406 U.S. at 748-49, 92 S.Ct. at 1946.
 
 
 18
 Were we able to utilize a more expansive notion of what is "arbitrary, capricious, and an abuse of discretion", we might have been receptive to some of the arguments presented by the petitioners. See, e. g., Allegheny-Ludlum Steel Corporation v. United States, 325 F.Supp. 352 (W.D.Pa.1971) (reversed, 406 U.S. 742, 92 S.Ct. 1941, 32 L.Ed.2d 453 (1972)). For it can be said with some confidence that the ICC's discussion of some of the points raised by the petitioners was, at best, laconic. What the three judge court noted in Allegheny-Ludlum Steel, supra, may have special pertinence here: "We are puzzled that a seven-year study by that Commission, which included a fifty-day hearing before an examiner with a record amounting to 6,000 pages, was climaxed by a spartan, one sentence finding . . . ." 325 F.Supp. at 354.
 
 
 19
 Nevertheless, measuring the present petitions against the appropriate standard of judicial review, we conclude that the Commission's findings and conclusions "are rationally supported". And to the extent that evidence was required in the record to support the contested conclusions, we find it sufficient to sustain the exercise of the ICC's rulemaking authority.
 
 
 20
 Accordingly, the several petitions for review will be denied.
 
 
 
 *
 Honorable A. Sherman Christensen, of the United States District Court for the District of Utah, sitting by designation