**FLORIDA EAST COAST RAILWAY COMPANY, Plaintiff,**

v.

**UNITED STATES of America and Interstate Commerce Commission, Defendants.**

**SEABOARD COAST LINE RAILROAD COMPANY, Plaintiff,**

v.

**UNITED STATES of America and Interstate Commerce Commission, Defendants.**

**Civ. Nos. 70–574–J–S, 70–577–J–S.**

United States District Court,
M. D. Florida,
Jacksonville Division.

Dec. 14, 1973.

Elliot Richardson, Atty. Gen. of the U. S., John H. D. Wigger, Atty., U. S. Dept. of Justice, Washington, D. C., Theodore C. Knappen, Atty., I. C. C., Washington, D. C., John L. Briggs, U. S. Atty., Jacksonville, Fla., Fritz R. Kahn, Gen. Counsel, I. C. C., Washington, D. C., for defendants.

Louis T. Duerinck, Chicago, Ill., Dan R. Schwartz, Jacksonville, Fla., for Chicago and North Western Railway Co.

A. Alvis Layne, Washington, D. C., Walter G. Arnold, Jacksonville, Fla., Richard A. Hollander, Richmond, Va., Philip A. Webb, III, James E. Cobb, Jacksonville, Fla., for plaintiffs.

Before RONEY, Circuit Judge, and YOUNG and SCOTT, District Judges.

## ORDER AND OPINION

CHARLES R. SCOTT, District Judge:

Plaintiffs, two railroad companies, filed these cases seeking injunctive relief restraining the United States of America and the Interstate Commerce Commission (ICC) from enforcing an order of the ICC prescribing a scale of incentive per diem charges for general

service, unequipped boxcars.[1] *Ex Parte 252* (Sub-No. 1), *Incentive Per Diem Charges*—1968, 337 I.C.C. 246 (1970). After a three-judge court was constituted pursuant to 28 U.S.C. §§ 2284 and 2325, a hearing was held on the merits of the complaint. Chicago and North Western Railway Company, a party to the ICC proceeding, was granted leave to intervene as of right as a party defendant in this case pursuant to 28 U.S.C. § 2323. The three-judge court, 322 F.Supp. 725, set aside the incentive per diem order of the ICC as it affected these plaintiffs on the ground that the Commission had failed to comply with the applicable provisions of the Administrative Procedure Act. The Court did not reach the merits of plaintiffs' other contentions.

As a condition of the injunction the Court ordered plaintiffs to maintain accounting records of the amounts of incentive per diem charges they would have paid or would have received had the injunction not been in effect. On appeal the Supreme Court of the United States reversed the three-judge panel on the procedural issue and remanded the case for consideration of those contentions of the parties which had not been otherwise disposed of.

Plaintiff Florida East Coast Railway Company (FEC) contends (1) that the challenged Commission order was arbitrary, capricious and an abuse of discretion, (2) that the challenged order was unreasonable and not adequately supported by the evidence before the Commission, (3) that the order as applied to FEC violates substantive due process of law, and (4) that the Commission should have exempted FEC from application of incentive per diem charges because it is a terminating line.

Plaintiff Seaboard Coast Line Railroad Company (SCL) contends (1) that the challenged order was not adequately sup-

ported by the evidence before the Commission and was arbitrary and capricious, (2) that the order deprives SCL of due process of law in that it confiscates its property for the benefit of other railroads, and (3) that, if the incentive per diem order is upheld, restitution of the charges that would have been paid by SCL had the injunction not been in effect should not be ordered.

## I. GENERAL SCOPE OF JUDICIAL REVIEW

At the outset the Court must determine the proper scope of judicial review available for measuring actions by the Interstate Commerce Commission. Defendants United States of America and the Interstate Commerce Commission argue that the scope of judicial review of actions by the ICC, which has traditionally been limited to determining whether "substantial evidence" supports the ICC action,[2] has recently been altered by the Supreme Court opinion in United States v. Allegheny-Ludlum Steel Corporation, 406 U.S. 742, 92 S.Ct. 1941, 32 L.Ed.2d 453 (1972). Defendants contend that the scope of judicial review of ICC actions was narrowed by that case, and now the Court is confined to determining whether the actions of the Commission have a rational basis.

In *Allegheny-Ludlum* a railroad case involving the ICC, the Supreme Court speaks of both "substantial evidence" and of a "rational basis" as standards for measuring the degree of permissible judicial review of ICC actions. This Court does not believe that these two phrases provide for identical measures of judicial review. For example, the scope of review is broader where the Court may inquire into whether there is substantial evidence to support a Commission action than it is where the inquiry is limited to wheth-

---

1. Incentive per diem charges are financial obligations, in addition to rental fees, paid by one railroad for the use of the freight cars of another railroad. A railroad that has a net incentive balance, that is, an excess of incentive charges received over those paid by

it, must set aside that balance as earmarked funds for the purchase, building or rebuilding of general service, unequipped boxcars.

2. Western Chemical Co. v. United States, 271 U.S. 268, 46 S.Ct. 36, 70 L.Ed. 941 (1926).

er the Commission's conclusions are rationally supported.

In *Allegheny-Ludlum* the Court said that,

> The standard of judicial review for actions of the Interstate Commerce Commission in general, . . ., is well established by prior decisions of this Court. We do not weigh the evidence introduced before the Commission; we do not inquire into the wisdom of the regulations which the Commission promulgates, and we inquire into the soundness of the reasoning by which the Commission reaches its conclusions only to ascertain that the latter are *rationally supported*. (Emphasis supplied)

United States v. Allegheny-Ludlum Steel Corporation, 406 U.S. 742, 748–749, 92 S.Ct. 1941, 1946, 32 L.Ed.2d 453 (1972).

At a later point in the same opinion the Court refers to each standard of judicial review in succeeding paragraphs.

> If the Commission were thrusting these regulations upon an admittedly smoothly functioning transportation industry, well supplied with necesseary rolling stock and adequately serving all shippers, the *rationality* of its action might well be open to question.
>
> But such is not the case. The Commission's finding that there are recurring periods of significant length when there is not an adequate freight car supply to service shippers is supported by *substantial evidence*. (Emphasis supplied)

United States v. Allegheny-Ludlum Steel Corporation, 406 U.S. 742, 753, 92 S.Ct. 1941, 1948, 32 L.Ed.2d 453 (1972).

■ It appears that *Allegheny-Ludlum* outlines a two-tier approach to judicial review of ICC actions. In certain particular instances the Court possesses broader review powers and measures the Commission action against the "substantial evidence" standard, while in other

particular instances the review is limited to measuring Commission action against the "rational basis" standard.

In *Allegheny-Ludlum* the first tier review was exercised when the Court ruled that there was "substantial evidence" to support the Commission finding that there was not an adequate freight car supply to service shippers. Once this initial finding was properly made, the Commission was empowered to promulgate reasonable rules with respect to railroad car service under the Esch Car Service Act. The determination of whether a car shortage exists is jurisdictional in the sense that, if no such shortage is proven, the Commission has no authority to promulgate rules and regulations to alleviate a shortage.[3]

■ Similarly in the instant case this Court must determine, if there is substantial evidence for believing that there is a national shortage of general service, unequipped boxcars. This is the first tier of review and, because of its jurisdictional aspects, has as its benchmark the broader "substantial evidence" standard.

In the second tier review in *Allegheny-Ludlum* the Supreme Court examined the challenged rules only to see if the Commission conclusion that the rules would help alleviate the car shortage problem was "rationally supported". Since the jurisdictional question had already been resolved in the tier one review, the Court exercised the more limited review in tier two.

■ Similarly in the instant case this Court must determine if the conclusion of the ICC that the incentive per diem rule will help alleviate the shortage of general service, unequipped boxcars is "rationally supported". Therefore, the Court's authority to review the initial determination of boxcar shortage is broader under *Allegheny-Ludlum* than is its authority to review the determination that certain rules will help alleviate that shortage.

3. The Commission shall not make any incentive element applicable to any type of freight car the supply of which the Commission finds to be adequate. 49 U.S.C. § 1(14)(a).

Section 706(2) of Title 5, United States Code, provides that only in cases which are subject to §§ 556 and 557 of the Administrative Procedure Act (APA), that is, cases where formal hearings are required, shall the scope of review be so broad as to encompass the substantial evidence standard. This case is subject only to § 553 of the APA, and is not subject to the provisions of §§ 556 and 557 thereof. United States v. Florida East Coast Railway Co., 410 U.S. 224, 93 S.Ct. 810, 35 L.Ed.2d 223 (1973).

The Court notes that, if the challenged order were not the product of a rulemaking proceeding of the ICC, but was the product of a quasi-judicial adjudicatory proceeding of the ICC the previously enunciated standards of review would not be applicable. United States v. Allegheny-Ludlum Steel Corporation, 406 U.S. 742, 749 and 757, 92 S.Ct. 194, 32 L.Ed.2d 453 (1972).

## II. SCOPE OF JUDICIAL REVIEW HEREIN

Practically speaking it makes no difference in this case whether the "substantial evidence" test or the more limited "rational basis" test is the proper standard against which to measure the Commission's findings that a national shortage of plain boxcars exists, because there is more than "substantial evidence" of such shortage. On the other hand, the determination that incentive per diem charges will help alleviate the boxcar shortage is not so apparent in this case and might not pass judicial muster if the "substantial evidence" test were used as a standard against which to measure the Commission action.

In its interim report announcing the tentative decision to adopt incentive per diem charges, the Commission makes the General Observation that,

> Although we cannot know whether incentive per diem will succeed, we do know that there are serious car supply problems, and that we possess the statutory authority to add an incentive

element in an effort to solve them . . . The solution proposed, we emphasize, is tentative only.

*Ex Parte* No. 252 (Sub-No. 1), *Incentive Per Diem Charges*—1968, 337 I.C.C. 193 (1969).

Furthermore, in its final report announcing an order imposing incentive per diem charges, the Commission reiterated this general observation as follows:

> [W]e cannot be certain that the incentive per diem will increase the car fleet by any substantial number, or, if it succeeds in that respect, that it will alleviate the car shortage. Nevertheless, we believe the new charges coupled with the rule governing the implementation of the charges should produce improvements over a period of years.

*Ex Parte* No. 252 (Sub-No. 1), *Incentive Per Diem Charges*—1968, 337 I.C.C. 225 (1970).

Thus while apparently conceding that there may not be substantial evidence to support the conclusion that incentive per diem charges will help alleviate the boxcar shortage, the Commission believes there is substantial evidence to support its finding that a shortage exists. Furthermore, it seems clear that the Commission itself believes the decision to institute incentive per diem charges as a partial remedy for the problem is rationally supported.

### (A) *Substantial Evidence Standard*

■ There is substantial evidence on which the Commission could base a conclusion that a shortage of general service, unequipped boxcars exists. For example, the Commission in recent years received numerous complaints, originating generally with railroads, or their shippers, alleging a lack of available freight cars to satisfy demands therefor at specific locations, or in specific areas.[4] Furthermore, in 1968, the ICC conducted a study of car demand and supply conditions throughout the .country.[5] After the results of this exhaustive

---

4. *Ex Parte* No. 252, *Incentive Per Diem Charges*—1968, 332 I.C.C. 14 (1967).

5. *Ex Parte* No. 252 (Sub-No. 1) *Incentive per Diem Charges*—1968, 337 I.C.C. 183–216 (1969).

study, in which the railroads participated, were accumulated and analyzed, the Commission concluded that,

> The present data show that despite the introduction of new types of equipment, demand for the standard boxcar cannot be satisfied from existing sources of equipment for at least half the calendar year.[6]

The freight car study proceeded on a sampling of the stations of 135 line-haul railroads from January 29, 1968, to December 31, 1968. A total of 32,420 reports were filed by the 135 participating railroads during the study period. All geographic zones of the continental United States were included in the sampling. Study stations were chosen on the basis of volume of traffic, and only the larger roads were selected. Significant deficiencies in placement of general service, unequipped boxcars were confirmed by the results of the study.

The 1968 study provides valid statistical evidence of the shortage of plain boxcars and, in conjunction with the other evidence before the Commission, if not alone, affords "substantial evidence" of a shortage of general service, unequipped boxcars.

### (B) *Rational Basis Standard*

■ There is a rational basis for believing that substantial evidence exists on which the Commission could conclude that incentive per diem charges would help alleviate the shortage of general service, unequipped boxcars. Although the Commission report issued October 3, 1967, concluded that there was not available at that time reliable factual data upon which to make a valid decision as to the imposition of incentive per diem charges,[7] later reports concluded that incentive charges should help alleviate the

shortage. For example, the Commission report issued December 12, 1969, concluded that there was "sufficient data to reach a conscientious and informed judgment regarding the form and amount of an incentive charge that will continue to provide just and reasonable compensation, while both improving car utilization and increasing car supply".[8]

■ The only reliable method by which the Court may properly determine whether there is a rational basis for the challenged agency action is to analyze each element of that action. If each is rationally supported, the Court should conclude that the action as a whole is rationally supported. There are three principal elements of incentive per diem charges which must be considered: the amount of the charges, the duration of the charges and the use of the funds realized as a result of the charges.

### (1) *Amount of Incentive Charges*

In determining the amount of incentive per diem to be charged, the Commission concluded that a creditor railroad [9] should receive, in addition to the basic rental charges for use of another railroad's boxcar, an annual 12 percent rate of return on the investment in general service, unequipped boxcars. A rate of return of 12 percent was adopted by the ICC after consulting Internal Revenue Service data reported on the returns of 1,468,725 corporations throughout the United States. The 12 percent figure was reached by considering the facts that, (1) after taxes the net income of these IRS reporting corporations comprised the rate of return on net assets of 8.9 percent, (2) the railroad return on net assets before taxes was 3.8 percent, and (3) the actual tax rate paid by the railroad industry in comparison with other corporations is generally lower.

---

6. *Id.* at p. 186.

7. *Ex Parte* No. 252, *Incentive Per Diem Charges*—1968, 332 I.C.C. 18 (1967).

8. *Ex parte* No. 252 (Sub-No. 1), *Incentive Per Diem Charges*—1968, 337 I.C.C. 193 (1969).

9. A creditor railroad is, for the purposes of this opinion, a railroad with a "net incentive balance" as that phrase is defined in footnote 1, *supra.*

The Commission reasoned that a 12 percent rate of return should encourage the rapid return of non-owned cars to the owner road, since the basic rental charges provide only for a 6 percent return on investment.[10]

### (2) *Duration of Charges*

Originally the Commission imposed 6-month incentive per diem charges on the theory that such an application during fall and winter months should tend to speed up the use and movement of plain boxcars in those periods and should encourage the return of cars to their owners. Failing that, a 6-month application should, the Commission reasoned, nevertheless produce a steady annual flow of funds to the creditor per diem roads with which they could purchase additional plain box cars.[11]

It has come to the Court's attention that incentive per diem charges have now been extended by the Commission and are imposed on a 12-month basis; but there is no issue involving this extension presently before the Court.

### (3) *Earmarking of Funds*

A railroad which is the recipient of incentive per diem payments must set aside its net incentive balance as earmarked funds for the purchase, building or rebuilding of general service, unequipped boxcars and can use those funds for no other purpose. The Commission theorized that such earmarking would result in expansion of the number of plain boxcars in the national fleet and would, therefore, help alleviate the shortage.

The method used by the Commission for arriving at the amount of incentive per diem to be charged, and the amount ultimately selected for imposition are both rationally supported Commission actions. Furthermore, the determination to initially impose the charges for six months of the year is a rationally supported decision of the Commission, rea-

sonably intended to help alleviate the car shortage. Finally, the earmarking of funds provision of the ICC regulation, which provides the heart and soul of the entire plan, is also rationally supported as a method helping to alleviate the shortage.

■ After reviewing the entire record, the Court finds the conclusion of the ICC that incentive per diem charges will help alleviate the nationwide shortage of general service, unequipped boxcars is "rationally supported" as that phrase is used in United States v. Allegheny-Ludlum Steel Corporation, *supra*.

### III. PLAINTIFFS' GENERAL CLAIMS

■■ From the Court's finding that there exists a rational basis for the Commission's promulgation of the incentive per diem rule, it naturally follows that FEC's argument that the Commission's action was arbitrary, capricious or an abuse of discretion must fail. Furthermore, a finding by the Court of the required "rational basis" to support the order precludes any argument by FEC that the order was unreasonable and not adequately supported by the evidence before the Commission. The Court specifically finds a sufficient relationship between the Commission's conclusions and the factual bases in the record upon which it relied to substantively support this exercise of its authority to promulgate an incentive per diem rule. The Court further specifically finds the Commission order reasonable as that term is used in United States v. Allegheny-Ludlum Steel Corporation, *supra*.

### IV. PLAINTIFFS' CLAIM THAT ORDER VIOLATES SUBSTANTIVE DUE PROCESS OF LAW

■ The Supreme Court in its opinion in the instant case held that the procedures employed by the Commission in promulgating the challenged incentive

---

10. *Ex parte* No. 252 (Sub-No. 1), *Incentive Per Diem Charges*—1968, 337 I.C.C. 187–189 (1969).

11. *Ex parte* No. 252 (Sub-No. 1), *Incentive Per Diem Charges*—1968, 37 I.C.C. 186 (1969).

per diem rule comported with procedural due process, and further found that all the "hearings" required for such a rule-making proceeding had been provided. Nevertheless, plaintiffs claim that, since they are net incentive balance debtor railroads,[12] they will be compelled to subsidize creditor railroads by paying incentive per diem charges to them, and that these funds will be used by the creditor roads for purchasing boxcars for the creditors' fleets. Plaintiffs contend this procedure of taking funds of one railroad and giving them to another in order to enable the latter to improve its equipment is confiscatory of the former's property without due process of law, in violation of the Fifth Amendment. Plaintiffs further contend that, as such, the procedure is an exercise of the Commission's adjudicatory, rather than rule-making, authority.

The plaintiff railroads rely on the case of Railroad Retirement Board v. Alton R. Co., 295 U.S. 330, 55 S.Ct. 758, 79 L.Ed. 1468 (1935), as support for their Fifth Amendment argument. That case held that a statute which, in establishing a compulsory retirement pension system for employees of carriers subject to the Interstate Commerce Act, made no specified length of service or any contribution to the pension fund a prerequisite to eligibility for the pension, was confiscatory of the carrier's property in violation of the due process clause of the Fifth Amendment. It was specifically held that "railroads, though their property is dedicated to the public use, remain the private property of their owners, and that their assets may not be taken without just compensation".[13]

In that case there was no rational relationship between the length of service of an employee and his eligibility for a pension or between the size of his contribution to the pension fund and his eligibility for a pension. Furthermore, the Court found that placing the burden of maintaining a pension fund for employees of all solvent or insolvent railroad carriers on those carriers which remain solvent was a taking of property without due process.

The instant case is distinguishable from Railroad Retirement Board v. Alton R. Co., *supra*. Here there is a rational relationship between the burden placed upon debtor railroads and the benefits to the entire railroad industry which result from the increase in the plain boxcar fleet. Furthermore, placing the burden of increasing the number of plain boxcars in the nationwide fleet on all carriers in proportion to the use a borrowing road makes of the cars of an owning road is substantially different from imposing the burden of contributing to the pension fund of employees of an insolvent road upon a solvent road. In the latter situation the contributing railroad receives no benefits for its payments to the pension fund, and due process of law is thus violated. In the instant case both creditor and debtor roads, indeed the entire nationwide rail industry, benefit from the increase in boxcar availability.

This Court is bound to hold unlawful and set aside agency action, findings and conclusions found to be contrary to constitutional right, power, privilege or immunity.[14] But the agency action in this case of imposing universally applicable incentive per diem charges does not fall within any of these prohibited categories.

The Supreme Court opinion in the instant case made it clear that the ICC action in ordering the institution of incentive per diem charges was an exercise of rulemaking power rather than of adjudicatory power.

In contrast, Mr. Justice Douglas, in the dissent, reasons that the challenged in-

---

12. That is, it pays more incentive per diem charges to other railroads than it collects from them.

13. Railroad Retirement Board v. Alton R. Co., 295 U.S. 330, 357, 55 S.Ct. 758, 765, 79 L.Ed.

1468 (1935) ; *See also*, Interstate Commerce Commission v. Oregon-Washington R. & Nav. Co., 288 U.S. 14, 53 S.Ct. 266, 77 L.Ed. 588 (1933).

14. 5 U.S.C. § 706(2)(B).

centive order was adjudicatory because it determined the measure of financial responsibility of one railroad for its use of the rolling stock of another road. If the order was, in fact, adjudicatory of individual financial responsibility whereby a small number of persons were "exceptionally affected, in each case upon individual grounds" then a further due process hearing would be necessary. Bi-Metallic Investment Co. v. State Bd. of Equalization, 239 U.S. 441, 446, 36 S.Ct. 141, 142, 60 L.Ed. 372 (1915).

Nevertheless, the majority of the Court rejected this argument and in contrast to the dissent, found the challenged order to be the product of ICC rulemaking rather than adjudication. In the first sentence of the majority opinion, the Court states that this is a rulemaking proceeding under consideration. Furthermore, in the penultimate paragraph of the opinion, the Court states,

> Here the incentive payments . . . were applicable across the board to all of the common carriers by railroad subject to the Interstate Commerce Act. No effort was made to single out any particular railroad for special consideration based on its own peculiar circumstances.

United States v. Florida East Coast R. Co., 410 U.S. 224, 245, 93 S.Ct. 810, 821, 35 L.Ed.2d 223, 239 (1973).

Therefore, the argument that the Commission order was adjudicatory and the method of its institution is violative of due process of law may not be successfully maintained in light of the Supreme Court opinion in this very case.

Plaintiffs argue that the Commission cannot take their property for the purpose of conducting an incentive per diem charge experiment without due process being violated. At an earlier point in this opinion where the Court, while summarizing the facts which support the challenged Commission action, determined that a rational basis exists for the incentive per diem rules. Therefore, the

experimental nature of the rules is irrelevant.

Plaintiffs also urge the Court to strike down the Commission order on the ground that there were no facts before the Commission on which to base a finding that incentive charges would remedy boxcar shortage. This issue was also fully considered, discussed and rejected at an earlier point in this opinion where the Court summarized the facts which support the challenged Commission action. Furthermore, the Supreme Court resolved this issue when the case was before it.

> Though the Commission obviously relied on factual inferences as a basis for its order, the source of these factual inferences was apparent to anyone who read the order of December 1969. The factual inferences were used in the formulation of a basically legislative-type judgment, for prospective application only, rather than in adjudicating a particular set of disputed facts.

United States v. Florida East Coast R. Co., 410 U.S. 224, 246, 93 S.Ct. 810, 821, 35 L.Ed.2d 223, 239–240 (1973).

 After a review of the applicable law the Court finds that plaintiffs have been denied no procedural or substantive due process rights by the promulgation and implementation of incentive per diem charges on general service, unequipped boxcars.

## V. FEC's CLAIM TO AN EXEMPTION AS A TERMINATING LINE

FEC claims it is entitled to exemption from paying or collecting incentive per diem charges because it is a terminating line. It shows that, as a predominantly terminating railroad, it continuously has a surplus of boxcars on its lines, and further argues that, once a railroad establishes that it terminates more cars than it originates it is entitled to an exemption.

■ Section 1(14)(a) of the Interstate Commerce Act authorizes the Commission to exempt a "group of carriers" from paying any incentive element if such exemption is found .to be in the national interest. Thus the Commission has controlled discretion to grant an exemption from incentive per diem charges only when it is found to be in the national interest to do so.

■ In seeking an exemption the burden is on a terminal line to show that such an exemption is in the national interest. The Commission in this case found that terminating lines had not carried that burden.[15]

> In our view, it would not be in the national interest to exempt a group of carriers merely because they terminate a substantially greater number of carloads than they originate, or because they already own a sufficient number of cars to satisfy their own needs.
>
> [A] terminating railroad, like any other railroad, has a substantial interest in the maintenance of a national car supply, whether by direct purchase, or indirectly by better enabling the creditor roads to augment the car fleet.

*Ex Parte* No. 252 (Sub-No. 1), *Incentive Per Diem Charges*—1968, 337 I.C.C. 232 (1970).

■ If the incentive per diem order, in its generalized application to the nationwide railroad industry, is reasonable and is rationally supported, the fact that one road feels the impact of it more strongly than does another cannot alone act to invalidate the rule as to the former. In the 1927 railroad assigned car case of United States v. Berwind-White Coal Mining Co., 274 U.S. 564, 47 S.Ct. 727, 71 L.Ed. 1204 the Court stated that,

> The argument most strongly urged is that, because the rule prescribes absolute uniformity, regardless of the necessities of the railroad or other con-

sumer, regardless of the ownership of the mine or the cars, regardless of the character of the business done by the mine or its customer, it is necessarily unreasonable, and, hence, that the order is void. But the authority to establish reasonable rules conferred by paragraph (14) [of the Interstate Commerce Act] includes power to prescribe a rule of universal application.

274 U.S. 564 at 580, 47 S.Ct. 727 at 733.

In the instant case the Commission determined that the shortage of plain boxcars was a nationwide problem which required a nationwide rule of general application for its solution. All railroad carriers were required to do their share to help alleviate the problem. The incentive per diem rule was properly determined to be reasonable in its generalized nature, and this determination was rationally supported by the evidence before the Commission.

The terminating line issue was raised in the Supreme Court when this case was before that forum. In its opinion the Court said,

> Indeed, one of the objections of appellee Florida East Coast was that it and other terminating carriers should have been treated differently from the generality of the railroads. But the fact that the order may in its effects have been thought more disadvantageous by some railroads than by others does not change its generalized nature.

410 U.S. 224, at 246, 93 S.Ct. 810 at 821, 35 L.Ed.2d 223 at 239.

■ FEC's plea is well taken when it argues that the constitutionality of a rule, valid on its face, may be assailed by proof of facts tending to show that the rule as applied to a particular article is without support in reason because the article, although within the prohibited class, is so different from others of the class as to be without the reason for the prohibition. United States v. Carolene Products Co., 304 U.S. 144, 58 S.Ct. 778, 82 L.Ed. 1234 (1938);

---

15. *Ex parte* No. 252 (Sub-No. 1), *Incentive Per Diem Charges*—1968, 337 I.C.C. 234 (1970).

Railroad Retirement Bd. v. Alton R. Co., 295 U.S. 330, 55 S.Ct. 758, 79 L.Ed. 1468 (1935). Nevertheless, inquiries into the constitutional validity of such legislative judgments must be restricted to the issue whether any state of facts either known or which could reasonably be assumed affords support for the challenged rule. United States v. Carolene Products Co., 304 U.S. at 153–154, 58 S.Ct. 778 (1938).

In the instant case facts which were both known by the Commission and which might reasonably be assumed by the Commission afford support for the generalized application of the incentive per diem rule.

Finally, FEC argues that it should be afforded the opportunity for hearing on the question of exemption. The Supreme Court has held that the hearing requirements of both 49 U.S.C. § 1(14)(a) and the Administrative Procedure Act have been met. The Court also found that the Commission's consideration of the statements submitted by the two plaintiffs met the hearing requirements of § 1(14)(a). Thus, the Supreme Court has resolved, adversely to plaintiffs, the issue of whether further hearing is required on the exemption question or on any other question relating to the procedure employed in adopting the incentive per diem rules.

 While the Court has some reservations as to the equity of a general application of the incentive per diem rule so as to include terminal railroads such as the FEC, the law requires the conclusions reached herein. Therefore, the Court finds that the Commission acted rationally and within the broad discretion specifically granted by the statute in concluding that the granting of an exemption for terminating railroads would not be in the national interest.

## VI. RESTITUTION

Once having upheld the Commission's order, the Court must now reach the question of whether plaintiffs should be required to make restitution of the incentive per diem payments that would have been due creditor railroads had the temporary restraining order not been in effect. Since the amendment to the temporary restraining order, entered herein August 31, 1970, specifically required FEC and SCL to keep records of the amount of per diem charges due creditor railroads, there should be no dispute as to the amounts that are presently due and owing.

 The Court concludes that, having entered a temporary restraining order which allowed plaintiffs to become the only two railroads in the country not covered by the incentive per diem rules during the pendency of this judicial review, and having ultimately sustained the validity of those rules, Florida East Coast Railway Company and Seaboard Coast Line Railroad Company should properly make restitution of those funds withheld under the temporary restraining order.

Seaboard Coast Line Railroad Company indicated to the Court, through counsel, at the final hearing that, unless ordered to do so, it would not make restitution for the incentive per diem charges accrued during the pendency of the restraining order. Therefore, the Court will hereafter specifically direct plaintiffs to make such restitution.

Plaintiffs seek to have the Court order that the Commission conduct further hearings for the purpose of determining whether restitution should be decreed. This procedure is unnecessary and would permit plaintiffs to relitigate many of the issues which have already been disposed of herein.

Plaintiffs' reliance on Atlantic Coast Line R. Co. v. Florida, 295 U.S. 301, 55 S.Ct. 713, 79 L.Ed. 1451 (1935), in support of their argument that restitution should be denied is misplaced. Under the facts of that case restitution was denied where a railroad carrier collected freight charges in accordance with a rate order of the ICC until such order was set aside. There the Court refused to order the carriers to repay the money which had been

collected under the ICC order. The instant case is clearly distinguishable on its facts.

Here we have had no money paid by FEC or SCL which must be returned, as would have been the case in Atlantic Coast Line R. Co. v. Florida, *supra*, had restitution been ordered. In this case, because of the separate ledger which was kept by FEC and SCL for computing incentive per diem charges, there should be no dispute as to the amounts presently due and owing. Therefore, restitution is a proper corollary to dissolving the temporary restraining order.

Nevertheless, in order to foreclose the possibility of further litigation in this cause regarding the dollar amounts owed by FEC and SCL for incentive per diem charges, all future disputes over these sums, if any, should be filed separately before the undersigned initiating judge, Charles R. Scott, and should not be made a part of this litigation.

### VII. MOTION TO INTERVENE

Southern Railway Company, a party to the proceeding before the Interstate Commerce Commission, seeks to intervene in this lawsuit as of right pursuant to the provisions of Rule 24(a)(1) of the Federal Rules of Civil Procedure and of 28 U.S.C. § 2323. Although Southern Railway could have intervened as of right at an earlier stage in this proceeding, as did Chicago and North Western Railway Company, it is foreclosed from doing so in such an untimely manner as it now pursues.[16] Southern cites no cases and the Court has found none which have permitted intervention at such an advanced stage of a lawsuit.

Although Southern seeks to intervene generally in this cause and not merely for purposes of arguing the issue of restitution, the Court cannot conceive of anything which Southern could now contribute to the resolution of the remaining issues. Furthermore, its rights, if any, to restitution of incentive per diem charges to which it would have been entitled from FEC and SCL had the temporary restraining order not been in effect, have been fully protected by this Court's disposition of that issue.

16. The motion of Southern Railway Company for leave to intervene was filed May 31, 1973. The final hearing before the three-judge court was set for and was held the following day, June 1, 1973.